JOHN B. GILFILLAN v. ANTON SCHMIDT and Others.[1]

January 29, 1896.

Nos. 9671—(215).

**Surface Waters—Deepening Natural Drain—Overflowing Adjoining Lands.**

The lands of the defendants were situated immediately north of those of the plaintiff, those of both parties sloping to the south at a grade of nine feet to the mile. The north part of defendants' lands formed a watershed, the surface waters from which naturally drained into a large pond or marsh, which was fed entirely by surface water. This pond or marsh had a natural outlet at its south end, whence, in the wet seasons of the year, its waters flowed, through a fairly well defined channel or waterway, southerly to and across plaintiff's land, into a small lake, and thence into Lake Minnetonka. This was the natural and only feasible drainage of defendants' lands. In wet seasons the pond or marsh on defendants' lands filled with surface waters from the surrounding watershed, covering 30 or 40 acres, but at other seasons ran off, evaporated, or was absorbed by the soil,

[1] Reported in 66 N. W. 126.

until the water only covered a few acres, to the depth of from two or three feet down to only a few inches. Much of the adjacent land, although wet and marshy, was susceptible of valuable improvement by drainage, but the waters stood on them so late in the season as to render them valueless. About 15 years ago, the defendants, for the purpose of draining these lands, deepened the outlet of this pond or marsh and the natural waterway thence south towards plaintiff's land about two feet, thus draining and reclaiming much land which would otherwise be valueless. They did not divert any of the water from its natural course, but merely aided the natural system of drainage. Neither have they done anything more than was necessary in the interests of good husbandry. In July, 1892, there was a very unusually heavy rainfall, which filled up the pond or marsh on defendants' lands, from which the waters flowed in great volumes through the outlet and channel deepened by the defendants; and, when it reached the north side of plaintiff's land, large quantities of this water left its natural course, and overflowed, in another direction, upon plaintiff's meadows, greatly damaging his crop of hay. There is no evidence that the water has thus overflowed either before or since, or that it is likely ever to occur, except under exceptional circumstances, in case of unusual rainfalls. Assuming that this overflow was caused by defendants' deepening the natural line of drainage, it does not appear that plaintiff cannot protect himself against its recurrence at small expense compared with the benefits resulting to the defendants by reason of the improved drainage of their lands. *Held*:

(1) That the evidence does not justify the conclusion that the overflow and consequent damage to plaintiff were caused by the acts of the defendants in deepening the natural outlet and way for these waters.

(2) But even if such acts will, in case of unusually heavy rains, render the water more liable to overflow, or to cause greater quantities of it to overflow upon plaintiff's meadows, yet, under the modified common-law rule as to the disposition of surface waters adopted in this state, and within the rules laid down in Sheehan v. Flynn, 59 Minn. 436, 61 N. W. 462, the defendants had a right to do what they did in the reasonable improvement of their own lands.

Action in the district court for Hennepin county for an injunction restraining defendants from maintaining a ditch across plaintiff's lands, and requiring defendants to fill up said ditch. The case was tried before Hicks, J., whose findings of fact are referred to in the opinion, and who found as conclusion of law that plaintiff was entitled to the relief demanded. From an order, Russell, J., denying a motion for a new trial, defendants Anton Schmidt, Mathias Clasen, and Henry Schmidt appealed. Reversed.

*Welch & Hayne*, for appellants.

*Gilfillan, Willard & Willard*, for respondent.

MITCHELL, J.   The findings of the trial court are very long, mainly descriptive of the situation, and largely consisting of statements of what may be called "evidentiary facts."   For this reason it is somewhat difficult to state wherein they are, and wherein they are not, sustained by the evidence.   An examination of the record, however, shows that there is no real conflict in the evidence.   It discloses substantially the following state of facts:

The lands of the two defendants Schmidt constituted a watershed, which naturally drained from the east, north, and west into a large marsh, slough, or pond, indicated on defendants' plat, situated mainly on the lands of the Schmidts, but extending a short distance into the north side of the lands of defendant Clasen.   The lands of the defendants in the immediate vicinity of this slough or pond were naturally wet and marshy, by reason of the spongy nature of the soil, their proximity to the pond, and the fact that they were only slightly elevated above the ordinary level of the water in the slough or pond; but they were capable, by drainage, of being rendered dry and valuable grass lands.   This slough or pond was not fed by any springs or natural streams, but entirely by surface waters from the adjacent watershed.

In the wet seasons of the year, this large marsh or slough filled with surface water from the surrounding watershed, covering from 30 to 40 acres, presenting the appearance of a large pond or small lake, from 6 to 8 feet deep in its deepest part, but, in the dry seasons, frequently covering only a few acres, to the depth of from 2 or 3 feet in its deepest part down to only a few inches in its shallowest places.   The natural outlet for the waters which thus collected in this slough or pond was at its south end, whence, in wet seasons, they flowed in a large stream southerly, through a fairly well defined course, on substantially the line of the ditch indicated on defendants' plat, into a pond or bog in the north part of plaintiff's land; thence, through a depression or outlet on the west side of this pond or bog, first, westerly, and then southerly, as indicated on the same plat, into Gleason's Lake, which, in turn, flowed into Lake Minnetonka.   In brief, the natural drainage of the large marsh or pond on defendants' lands, and of the watershed tributary to it, was substantially as indicated on defendants' map; and throughout its entire course the flow of this water was through a fairly well defined

natural depression in the soil.    The slope or fall of the lands was to the south, and about nine feet to the mile.

. As already stated, at certain seasons of the year the flow of water was quite large, while at others it would diminish, and, finally, in the dry portions of the year, entirely cease; leaving, however, a considerable quantity of water in the big marsh or pond on defendants' land, the effect of which was to leave the lands adjacent to this pond either covered or saturated with water so late in the season as to render them practically valueless.    The lowest point on the east or southeasterly side of the pond or bog on plaintiff's land was some three feet higher than the outlet on the west side, already described.    Hence the water in this pond or bog would have to rise about three feet above the level of this outlet on the west before any of it would overflow to the east or southeast.    Such was the condition of things before the defendants committed any of the acts complained of.

About 15 or 16 years ago, the defendants, or their grantors, for the purpose of draining their lands, dug a ditch from the south end of the big marsh or pond down to about the third or lowest stone culvert marked on defendants' map.    This ditch commenced at the natural outlet of the marsh, and substantially followed the natural waterway.    Practically, what defendants did consisted of deepening the outlet and waterway about two feet.    While this ditch has been repaired and cleaned out at different times, it still remains of substantially the same depth as when first dug.    Subsequently, and for the same general purpose, the defendants extended this ditch through Clasen's land, down to the bog or pond in the north side of plaintiff's land, also following substantially the line of the natural waterway.    This part of the natural waterway seems to have been more clearly defined than the part up next to the big marsh or pond, and what defendants did on it consisted mainly in straightening it, and removing local obstructions, but not greatly deepening it.    The defendants Schmidt have also extended the ditch up through the big marsh or pond, and likewise dug some short lateral ditches, as indicated on their plat, to aid the natural drainage of their lands into this large or central pond or marsh; but these acts are not important in the determination of this case.    Of course, the effect of deepening the outlet and natural waterway south of the big

marsh or pond is to cause more of the water to flow out, and to leave less of it to stand in the marsh, thereby so far relieving defendants' lands of the burden of these waters as to render much of them valuable meadow lands, which would otherwise be valueless. There is no evidence that defendants have done anything more than is necessary in the interests of good husbandry, or than they might lawfully do in the reasonable use of their own lands, provided they are not thereby casting a burden on plaintiff's lands which they have no right to do.

In July, 1892, there was an unusually heavy rainfall, from the effects of which the big marsh or pond on defendants' land rapidly filled with water, which flowed in great volumes through the ditch cut by defendants, into the slough or bog on the north of plaintiff's lands, and filled it up to so high a level that large quantities of water flowed out southeasterly, as indicated on plaintiff's map, and spread over his meadows, and either found its outlet into Parker's Lake, or else remained on the meadows until absorbed or evaporated, thereby causing serious damage to plaintiff's crop of hay. To secure protection against a recurrence of this injury, plaintiff brought this action for a preventive injunction, forbidding the defendants from maintaining the ditch across their lands.

There is no evidence and no claim that the digging of the ditch— that is, the deepening of the outlet and waterway of the big marsh or pond on defendants' land—imposes any additional burden upon, or does any injury to, plaintiff's land, unless it be by causing the water to overflow to the southeast, over his meadows. Neither is there any evidence that it ever did thus overflow either before or since the ditch was dug, except on this occasion, in July, 1892, after this unusually heavy rain. So far as appears, on all other occasions the water did not flow down any faster or in any greater volume than could find its outlet through its natural course into Gleason's Lake. The court finds that originally the natural flow of the water from the slough or bog on the north side of plaintiff's lands was southeasterly, down into Parker's Lake. In view of the topography of the country, this was probably so; but this is wholly immaterial in view of the fact, also found by the court, and supported by the evidence, that this had ceased long before the settlement of any of the lands in the vicinity, since which time the natural flow has been

64 M.—3

to the west, as already stated. There was no evidence as to wheth-er it was practicable for plaintiff to adopt means to guard against the danger of this overflow eastward upon his meadows, or, if so, at what expense. The situation, however, would seem to indicate that a feasible preventive would be to either widen and deepen the outlet to the westward, or raise the easterly bank of the bog or pond.

The trial court granted a mandatory injunction requiring the defendants to fill up the ditch to the depth of two feet, from the south end of the big marsh or pond down to the third or lowest cul-vert, and thus restore the condition of things as it existed before any artificial excavations were made.

It will be seen from the foregoing statement of facts that the de-fendants have not diverted any of these waters from their natural course. All that they have done was in aid of the natural and only system of drainage. The only effect of their acts in deepening the natural outlet of this marsh or pond is to cause more of these waters to flow out, and thus leave less of them standing on their lands than would have remained there had things continued in their natural condition. In view of the topography of the country, it is also apparent that this was the only means by which defendants could have drained their lands. It is also to be noted that the ob-ject and effect of what they did was not simply to drain and reclaim the bed of a permanent and well-defined lake, but to lower the water in a marsh or pond of variable size, so as to drain the adjacent low and swampy lands, and thus render them fit for use as pastures or meadows.

The decision of the trial court seems to be mainly predicated upon the assumption that it was the deepening of the outlet and natural waterway of the big pond or swamp which caused the water to overflow to the southeast, over plaintiff's meadows. It is far from clear that this assumption is correct. Of course, the effect of thus deepening the outlet and channel would be to cause more water to flow out of the swamp or pond. But this overflow would commence sooner. It would commence whenever the water in the marsh rose to the level of the outlet, and continue until it fell to that level. After the marsh or pond was once filled, if the rains

continued, the overflow would be the same whether the outlet remained at its original level or was lowered two feet by artificial excavations. So far as appeared, the water had never before overflowed easterly, over plaintiff's meadows; and, for anything that appears, the overflow on this occasion might have occurred, as the result of the unusual and extraordinary rainfall, even if the outlet and waterway had been left in their natural condition. It would seem self-evident that this might occur if the rains were sufficiently heavy and continued long enough. Therefore, it does not seem to us that the evidence furnishes any sufficient basis for the assumption of fact upon which the decision of the court must be sustained, if at all; for, unless the deepening of the natural waterway was the efficient and proximate cause of the overflow easterly, upon plaintiff's meadows, the plaintiff would not, under any view of the law, have a cause of action. No innovation or change in the distribution of water from a superior to an inferior tenement is material or the subject of condemnation, unless it works injury to the inferior estate. Peck v. Goodberlett, 109 N. Y. 180, 16 N. E. 350.

But we shall concede (which is the most that can be claimed for the evidence) that, so long as the natural channel for this water on plaintiff's land is left in its present condition, the acts of the defendants in deepening the channel on their lands will, at rare intervals, in case of extraordinary or unusual rainfalls, render the water more liable to overflow to the east, upon plaintiff's meadows, or to flow there in larger quantities, than they otherwise would. Still, under the modified common-law rule adopted in this state, defendants have done nothing but what they might lawfully do in the reasonable. improvement of their own lands. The small inland lakes of this state are in some respects sui generis. Some of them are fed mainly by surface waters, and yet are permanent and well-defined lakes. We do not wish to be understood as holding that such lakes continue to be surface waters. But, on the facts of the present case, we hold that the waters which collected on the defendants' lands never lost their character as surface waters. This so-called "pond" or "lake" was merely a large marsh, in which large quantities of surface water collected at certain seasons of the year, and mostly disappeared at others, but remained long enough to render the lands upon which they rested, and the adjacent lowlands, unfit for use. What defendants have done amounted merely to aiding

the natural drainage of these waters. They have done nothing more than was reasonably necessary in the interests of good husbandry. They have adopted the only feasible or possible means of draining their lands. In doing this, they have inflicted no unnecessary injury upon the plaintiff. The benefit to them appears to be very great as compared with any injury likely to result to plaintiff from their acts. There is nothing to indicate that plaintiff might not readily protect himself from any injury liable to result from defendants' acts.

The case is more than covered by Sheehan v. Flynn, 59 Minn. 436, 61 N. W. 462. It is true that in that case the collection of surface water was less than in the present case; also, that there the water entirely dried up in the summer; while here, in the natural condition of things, some of the water stood the year round in the lowest part of the marsh. But, on the other hand, in the Sheehan Case none of the water overflowed upon the plaintiff's land until the ditch was dug, and it then had no outlet from plaintiff's land, but rested there; while here the waters had a natural outlet and channel to and across plaintiff's land, and thence into Gleason's Lake, and finally into Lake Minnetonka. This whole question of the disposition of surface waters has been so recently and so fully considered in the Sheehan Case that it is unnecessary to discuss the question here at any length.

Much can be said both for and against the common-law rule on the subject. An argument often used, and at first sight plausible, is that a man ought not to be permitted to cast upon his neighbor's land a burden which nature has imposed upon his own. But the maxim that a man must use his own so as not to injure another is only true in a limited and qualified sense. No person has the absolute and unqualified legal right to the use of his own property unaffected by the reasonable use by his neighbor of his property. The use by my neighbor of his property in a particular way may discommode and injuriously affect me in the enjoyment of my property; but, if his use is a reasonable one, I must submit to any resulting inconvenience. The question, after all, is really one of reasonable use; and the common-law rule as to surface water is but an application of the universal rule, perhaps somewhat enlarged in the interests of agriculture and the improvement of lands.

Under the facts of this case, the plaintiff ought not to be allowed

to stand in the way of defendants' reasonable improvement of their lands, by aiding nature in their drainage.

Order reversed, and new trial granted.

START, C. J.   I concur in the result, on the ground that the evidence fails to establish plaintiff's claim that the deepening of the ditch was the proximate cause of the overflow easterly upon his meadows.   I dissent from so much of the foregoing opinion as approves of the doctrine of Sheehan v. Flynn, 59 Minn. 436, 61 N. W. 462.

BUCK, J.   While concurring in the result arrived at in the majority opinion, upon the same grounds as stated by the CHIEF JUSTICE, yet I feel that the doctrine laid down in the case of Sheehan v. Flynn, 59 Minn. 436, 61 N. W. 462, ought not to be adhered to. When that case was under consideration in this court, I reluctantly assented to the rule there adopted; but, upon reflection and more mature deliberation, I think that rule unsound.   I do not think that the private proprietary rights of one individual should be subject to the personal interests of another individual in the manner stated in that case.   It seems to me that it permits the taking of private property for private use, and that in its practical operation it will lead to endless litigation, if not great injustice.   From such doctrine I therefore dissent.