# IVER ENDERSON v. C. M. KELEHAN.[1]

April 30, 1948.

No. 34,571.

[1]Reported in 32 N. W. (2d) 286.

*Dell, Rosengren & Rufer,* for appellant.
*Field, Field & Arvesen,* for respondent.

MATSON, JUSTICE.

In an action to enjoin defendant from diverting certain surface waters onto plaintiff's land and to recover damages, judgment was entered for defendant dismissing the action on the merits. Plaintiff appeals.

Plaintiff is the owner of a quarter section of farm land in Otter Tail county situated to the northeast of, and catercorner to, a quarter section owned by defendant. Adjoining the land of plaintiff on the south and that of defendant on the east is another quarter section owned by one Loomer. Adjoining the land of plaintiff on the west and that of defendant on the north is a quarter section owned by one Swenson. The four farms together form a square of land equivalent to a section.

We are primarily concerned with the disposal of surface waters pertaining to an area corresponding to slightly more than the north half of defendant's farm. In the northwest corner thereof are four small depressions of an average area of one-half acre each. A little to the east is another depression comprising about an acre. Slightly to the west of the center of the farm is a depression covering about four acres, and adjacent to it are three smaller depressions aggregating approximately four additional acres. The foregoing depressions constitute a total area of 11 acres. To the east, a short distance from the line between defendant's farm and that of Loomer is a three-acre depression, and to the south of it are two more for an additional four acres. We are little concerned with the three depressions last above mentioned, except for the purpose of better illustrating the drainage problem found on defendant's farm. All

these depressions are shallow, and prior to the drainage work hereinafter described they did not interfere with the farming of the land except as they retained an accumulation of surface water from precipitation. The amount of water collected and the time for which it was retained varied according to the amount of moisture per season. In a dry season or late in the summer, the hollows would generally be dry or have little water in them. In the spring of each year, water from melting snows and rains would accumulate and remain in them until evaporated or absorbed by the earth. During wet periods, the water standing in the depressions would render not only the submerged portions of the land untillable, but also a considerable part of the surrounding area, which would be so saturated with moisture as to make the use of farm machinery impracticable. The net result was that for the important part of the growing season these depression areas were not only unfit for use but served as a series of barriers which made it difficult to farm the surrounding and higher terrain.

At this point we turn to a consideration of the natural slope or topography of defendant's farm to determine how the surface waters would naturally flow except as impounded by these depressions. The natural over-all slope was from west to east toward the Loomer farm. There is some evidence that years ago a small part of the northwest corner area drained northward to the Swenson farm, but whatever drainage in that direction ever existed gradually ceased over the years, because of the formation, as the result of dust storms, of a small ridge along the north fence line. At best, however, this northward drainage was insignificant in amount. As a general proposition, however, the slope was to the east and southeast. In the fall of 1942, defendant constructed his system of drainage by using a road grader to dig shallow watercourses from 10 to 12 feet wide with a depth of zero at the edges and sloping toward the center to a depth that varied, according to the lay of the land, from 0.6 to 1.8 feet. They were constructed with wide and sloping sides so as not to impede the passage of farm machinery. We are here concerned with only three of these so-called ditches. The first com-

menced with the most northwesterly depression in the northwest corner and extended in a southeasterly direction for a distance of about 600 feet. Depressions on either side were drained by branch ditches. At its beginning in the northwest corner, there was an elevation of 96.4 feet, and at its terminus an elevation of 95.4 feet, or a drop of 1 foot in 600 feet. The water, after following this ditch to its terminus, diffused itself over the land to follow the natural slope in a southeasterly direction until it reached the four-acre depression slightly west of the center of defendant's farm. The elevation at this central depression was 95.1 feet. In other words, there was a gentle slope of only 0.3 of a foot. Except for this gentle slope, the land was level. At the central depression, the second ditch commenced and ran north for a short distance, then turned to the east, and thence southeasterly, where it terminated at an elevation of 90.0, or for an over-all drop of 5.1 feet. The turn of the second ditch to the north for a short distance was made in the interest of developing a more workable field area. The water, after leaving the eastern terminus of the second ditch, diffused itself over the land to follow a slope to the east until it reached the three-acre depression (near the east line), where the elevation was only 85.3 feet. In other words, the second ditch had an over-all drop of 4.7 feet. The third ditch commenced at the three-acre depression, extended in a northeasterly direction, and terminated at a point just west of the east line, where the elevation is 82.7 feet. From the beginning of the first ditch to the termination of the third ditch, there was a total drop of 13.7 feet. After leaving the terminus of the third ditch, the water entered a natural ravine and flowed under the east fence in a northeasterly direction until it reached a large slough on the Loomer farm. When the Loomer slough overflowed, the water ran through an outlet to the north into another slough or depression in the pasture on plaintiff's farm. The depression on plaintiff's farm has an elevation of 64.6 feet and is 5.5 feet lower than the Loomer slough, and in turn the latter is 11.9 feet lower than defendant's east line. In other words, the depression on plaintiff's land is 31.8 feet lower than the starting point of the drainage project on defendant's farm.

Defendant's drainage system was completed in the fall of 1942. In the springs of 1943 and 1944, the waters from rain and snow, which in part had formerly remained entrapped in the depressions on defendant's land until they disappeared through percolation and evaporation, flowed in their entirety through the ditches into the Loomer slough and thence to the depression on plaintiff's land. In the spring of 1943, the slough or depression in plaintiff's pasture was filled with water over an area of 27 acres. Prior thereto, the normal springtime water deposit covered only about six or seven acres, although there was testimony to the effect that in 1937, a year of heavy rain and snow, an area of about 20 acres was submerged. It is with respect to this situation that plaintiff sues to recover damages and to enjoin defendant from maintaining his drainage system.

1. "Surface waters" consist of waters from rain, springs, or melting snow which lie or flow on the surface of the earth, but which do not form part of a well-defined body of water or natural watercourse.[2] They do not lose their character as surface waters merely because in a measure they are absorbed by or soak into the marshy or boggy ground where collected. Hartle v. Neighbauer, 142 Minn. 438, 172 N. W. 498.

2-3. With respect to surface waters, Minnesota has evolved the rule of reasonable use and follows neither the rule of the common law nor that of the civil law. Sometimes it has been inaccurately referred to as merely a modification of the common-law rule, but obviously it has attained a distinct and independent status. 24 Minn. L. Rev. 904, 909-913; 56 Am. L. Rev. 417. As promulgated in the leading case of Sheehan v. Flynn, 59 Minn. 436, 61 N. W. 462, 26 L. R. A. 632, and as amplified by subsequent decisions, the rule is that in effecting a reasonable use of his land for a legitimate purpose a landowner, acting in good faith, may drain his land of surface

[2]Hartle v. Neighbauer, 142 Minn. 438, 172 N. W. 498; San Gabriel Valley Country Club v. County of Los Angeles, 182 Cal. 392, 188 P. 554, 9 A. L. R. 1200; 6 Dunnell, Dig. & Supp. § 10160; 15 Boston L. Rev. 893; Restatement, Torts, § 846; 56 Am. L. Rev. 417; 3 Farnham, Waters and Water Rights, § 878.

waters and cast them as a burden upon the land of another, although such drainage carries with it some waters which would otherwise have never gone that way but would have remained on the land until they were absorbed by the soil or evaporated in the air, if

(a) There is a reasonable necessity for such drainage;

(b) If reasonable care be taken to avoid unnecessary injury to the land receiving the burden;

(c) If the utility or benefit accruing to the land drained reasonably outweighs the gravity of the harm resulting to the land receiving the burden; and

(d) If, where practicable, it is accomplished by reasonably improving and aiding the normal and natural system of drainage according to its reasonable carrying capacity, *or* if, in the absence of a practicable natural drain, a reasonable and feasible artificial drainage system is adopted.[3]

The problems arising out of the disposal of surface waters involve an infinite variety of factors and circumstances, and therefore the reasonable-use rule cannot be reduced to a cut-and-dried formula, but must remain flexible, according to the full and normal implications of the term "reasonable use," to allow for a consideration of each individual case according to its own peculiar facts. No one

---

[3]Sheehan v. Flynn, 59 Minn. 436, 61 N. W. 462, 26 L. R. A. 632; Gilfillan v. Schmidt, 64 Minn. 29, 66 N. W. 126, 31 L. R. A. 547, 58 A. S. R. 515; Bush v. City of Rochester, 191 Minn. 591, 255 N. W. 256; 6 Dunnell, Dig. & Supp. § 10165; 24 Minn. L. Rev. 904. See, Restatement, Torts, §§ 826-831, 833, 846; Simonson v. Township of Alden, 181 Minn. 200, 231 N. W. 921; Restatement, Torts, §§ 826, 827 (in re relation between benefit accruing and harm resulting); Peterson v. Lundquist, 106 Minn. 339, 119 N. W. 50 (in re duty to follow natural watercourse); Hopkins v. Taylor, 128 Minn. 511, 151 N. W. 194; Howard v. Illinois Cent. R. Co. 114 Minn. 189, 130 N. W. 946 (in re following natural watercourse an important but not necessarily a controlling factor); O'Brien v. City of St. Paul, 18 Minn. 163 (176); 6 Dunnell, Dig. § 10165a (in re reasonable carrying capacity of natural drain); Hopkins v. Taylor, *supra;* Erhard v. Wagner, 104 Minn. 258, 116 N. W. 577 (in re use of artificial watercourse and cutting of watershed); Gilfillan v. Schmidt, *supra* (in re diversion without damage); Nye v. Kahlow, 98 Minn. 81, 107 N. W. 733 (in re ravine or swale as natural drain).

factor or circumstance is controlling. What is reasonable use is a' question of fact to be resolved according to the special circumstances of each particular case. Rieck v. Schamanski, 117 Minn. 25, 134 N. W. 228; Hopkins v. Taylor, 128 Minn. 511, 151 N. W. 194; Bush v. City of Rochester, 191 Minn. 591, 255 N. W. 256.

4. The trial court's finding that defendant, in planning and executing his system of drainage, had made a reasonable use of his land is sustained by the evidence. A conflict in evidence, as found in the instant case, presents a fact issue, and the trial court's findings thereon will not be disturbed upon appeal unless they are manifestly and palpably contrary to the evidence as a whole. Shaughnessy v. Eidsmo, 222 Minn. 141, 23 N. W. (2d) 362, 166 A. L. R. 435. We have taken, as we must, the view of the evidence most favorable to the findings. In draining the depressions on his farm, defendant was pursuing the legitimate purpose of bringing about a reasonably necessary improvement for the more efficient tillage and utilization of the soil. Thereby, he was not only reclaiming a soil acreage coextensive with the area of the shallow potholes, but a much larger surrounding area, the tillage of which had theretofore been difficult, if not impossible, during wet seasons. There was some evidence that part of the soil reclaimed was unproductive because of alkali deposits, but there was also evidence that it was normally fertile and productive when not encumbered with excessive moisture. Competent testimony was presented to show that drainage had materially increased the value of defendant's farm. The benefit to defendant's land reasonably and substantially outweighed any harm that as a consequence resulted to that of plaintiff. The depression in plaintiff's pasture was a natural basin into which surface waters drained from much other land as well as defendant's quarter section. We are concerned only with the surface waters originating on defendant's farm. The trial court justifiably found that over and above the natural and normal flow of surface waters from defendant's to plaintiff's land the ditches contributed a comparatively insignificant increase in amount. In fact, the apparently unusual increase of water in plaintiff's natural catch basin, on the evidence adduced,

could reasonably be attributed to abnormally wet seasons involving extremely heavy falls of snow and rain. We have the further factor that the inundated area was normally used and suited for pasture land, and that a flooding thereof was by no means as harmful and lasting as in the case of farm land requiring early and regular tillage. In other words, any harm to plaintiff's land was of little gravity in comparison to the benefit accruing to defendant's acreage. We note also that defendant in constructing the ditches substantially followed the natural course of drainage. In the apt words of the trial court, "* * * the ditching the defendant did upon his * * * land amounted merely to aiding the natural drainage of the waters accumulating in * * * small sloughs or potholes on his said farm during seasons of excessive rainfall and snowfall." The elevation data supports this conclusion. With respect to the small area in the northwest corner of defendant's land, possibly it could have been drained to the north, but on the whole the surface waters there involved were too insignificant to justify, as a practical matter, a separate course of drainage. Plaintiff contends, however that in constructing the ditches defendant cut across certain ridges or water barriers. The evidence leads us to a contrary conclusion, in keeping with the trial court's findings. What plaintiff calls ridges appear to be nothing more than the natural land elevation which normally separates one low spot from another. Obviously, no drainage could ever be effected unless the rims surrounding low spots could be cut, with due regard, of course, to the slope of the land as a whole.

The judgment of the trial court is affirmed.

Affirmed.