[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
II
This case has come to the Court on the plaintiff's motion to adjudge the defendant in contempt of this Court's order entered on August 3, 1988, which instructed the defendant to install an artificial drainage system sufficient to afford relief to the plaintiff from the nuisance created by the defendant.
I. CASE TRAVEL
The plaintiff, Joseph A. Zannini, is the owner of a single family home at 20 Rosebank Drive in Providence, Rhode Island. The defendant, Arboretum Development, Downing Associates, Inc., is the developer of a condominium project, the Elmhurst Arboretum, on land contiguous to that of Zannini. In 1979, Downing began construction of Arbor Drive and the Elmhurst Arboretum on its land which lies higher than and north of Zannini's land.[1]
During and after the construction period, Zannini experienced water damage to his home and property. Three examples of the damage are: soil erosion, water seepage into Zannini's basement, and cracks in Zannini's basement walls. After repeated attempts on his part to resolve these problems with Downing, Zannini sued the Defendant.[2]
After a trial, this Court ordered that judgment in the amount of $3,534.75 be awarded to Zannini. More importantly, this Court ordered Downing to install an artificial drainage system sufficient to afford relief to Zannini from the nuisance created by Downing. The Court reached this decision based on the evidence showing that Downing's actions resulted in interference with Zannini's use and enjoyment of his land. Zannini's expert, Thomas Bowden, an engineer with 20 years experience in apartment, commercial, and highway drainage, filed a report that revealed that Downing's original contour plans for Arbor Drive and the Arboretum indicated a slope from Arbor Drive that would direct runoff toward the south as did the original condition. The construction of Arbor Drive would intercept part of the original drainage area directed toward Zannini's property.[3]
Bowden's analysis of drainage quantities showed that prior to the development the average runoff directed to Zannini's property was only 35 percent of what it had been prior to the Arboretum project. Bowden concluded that this foreseeable problem did not exist prior to the development and that the excess flow could have been prevented. To prevent the consequent flooding, erosion, holes, and seepage into Zannini's basement and patio, Bowden determined that an artificial drainage system was needed.
Further, this Court stated that the testimony of Downing's expert engineers did not refute Bowden's report. This Court stated that both Bowden's report and Zannini's testimony that prior to the project his yard and home were never invaded by water, established to the Court's satisfaction that the Arboretum construction caused the excess water on Zannini's property and the subsequent damage thereto.
II. PLAINTIFF'S ARGUMENT
Zannini argues that Downing is in contempt of this Court's Order entered on August 3, 1988, because a suitable drain has not been installed by the Defendant. According to Zannini, plans for the construction of a suitable drain were designed by engineers for Downing. This drain was to be constructed on the lower edge of the Arboretum property with a minimum of disruption. Zannini notes that "plans proposed by Garafalo Associates, dated January 9, 1989, called for a catch basin with double grates, edged by a berm, and a 4' manhole in three sections to conform to ASTM." Further, the plans proposed a location for the catch basin "approximately mid-way of the Zannini house on condominium property", and a twelve (12) inch pipe and the necessary pipe bedding. Zannini refers to the engineering detail and study of Mr. Bowden that demonstrated both a change in the drainage area and increased flow of surface water onto his land. As stated by Zannini, Bowden's calculations were accepted by Downing's engineers, and incorporated into the design of a new drainage system.
However, Zannini states that Garafalo's plans were not followed. Rather, Downing made arrangements with a contractor involved with the condominium association on a non-related matter to install a single grate at a different location and tied in a six (6) inch corrugated plastic line to the sewer pipe on Wyndham Avenue. Zannini maintains that this grate has failed to stem the flow of water from the Arboretum property to his property. Zannini argues that the Garafalo plan is based on ASTM requirements, and "the Downing `installation' is roughly one-half that and ill-positioned." Zannini states that if further proof is needed as to Downing's lack of compliance with the August 3, 1988, court Order, then the burden should be placed on Downing to demonstrate that "it has made a reasonable effort to comply with the order, i.e. the Garafalo ASTM specifications."
III. DISCUSSION
As Zannini and Downing acknowledge, the initial decision of the Court relies on Butler v. Bruno, 115 R.I. 264, 341 A.2d 735
(1975). Butler adopted the rule of reasonable use for surface waters. Under this rule, a property owner's liability turns on a determination of the reasonableness of his actions. The issue of reasonableness is a question of fact to be determined upon the consideration of all the relevant circumstances. Butler states that each possessor of land is legally privileged to make reasonable use of his land even though the flow of surface waters is altered by the landowner's actions and causes some harm to another's land. However, a possessor of land incurs liability when his harmful interference with the flow of surface waters is unreasonable. Id., at 273, 341 A.2d at 740.
As indicated, the issue of reasonableness or unreasonableness becomes a question of fact to be determined in each case upon a consideration of relevant circumstances. Butler found the factors used in Enderson v. Kelehan, 226 Minn. 163,32 N.W.2d 286 (1948) to be "the clearest and most appropriate in determining the relevant circumstances." The factors are: is there a reasonable necessity for such drainage?; has reasonable care been taken to avoid unnecessary injury to the land receiving the water?; does the benefit accruing to the land drained reasonably outweigh the resulting harm?; and when predictable, is the diversion accomplished by reasonably improving the normal and natural system of drainage, or if such a procedure is not practicable, has a reasonable and feasible artificial drainage system been installed?" Butler, 115 A.2d at 273, 341 A.2d at 740.
Butler referred to the widely cited case of Armstrong v.Francis Corp., 20 N.J. 320, 120 A.2d 4 (1956), written by then New Jersey Supreme Court Justice William J. Brennan, Jr. InArmstrong, the court wrote that society has a great interest in land being developed for the greater good. Armstrong, 20 N.J. at 330, 120 A.2d at 10. Justice Brennan stated that an additional consideration is whether the utility of the possessor's use of his land outweigh's the gravity of the harm which results from his alteration of the flow of surface waters. Id. at 330, 120 A.2d at 10. In continuing, the court wrote that modern society's mass home building projects are for the social good, "[but] no reason suggests itself why, in justice, the economic costs incident to the expulsion of surface waters in the transformation of the rural or semi-rural areas of our State into urban or suburban communities should be borne in every case by adjoining landowners rather than those who engage in such projects for profit." Id. at 330, 120 A.2d at 10.
Based on the facts that have transpired since the entry of the earlier order, this Court believes that Zannini is still injured, and that further relief is necessary. Although Downing has undertaken corrective measures to alleviate the flow of the surface waters onto Zannini's property, these corrective measures have proven to be insufficient to afford relief to Zannini from the nuisance created by Downing. Downing's construction did create a "reasonable necessity" for drainage from their land. Downing was legally privileged to make reasonable use of its land even though the flow of the surface waters was altered and caused harm to Zannini's land. Butler, supra and Armstrong,supra. However, when this Court applies the remaining factors from Butler to determine reasonableness, Downing's actions were not reasonable.
Downing has attempted to alleviate this problem, but more needs to be done to rectify the situation. Zannini's land continues to receive excess surface water and the grate installed by Downing is not performing effectively.
The benefit accruing to Downing's land which is being drained does not reasonably outweigh the resulting harm to Zannini's property. Id. at 273, 341 A.2d at 740; Armstrong, 20 N.J. at 330, 120 A.2d at 10. Zannini's backyard has continually received excess surface waters and silt. Further, Zannini's home has cracks in the basement walls and water is still seeping into the basement.
As was demonstrated by Downing's actions, the normal and natural system of drainage was unable to be improved, and the Court ordered the current artificial drainage system to be installed. However, this artificial drainage system has not alleviated the problem. Applying Armstrong, supra, to case at bar, the construction of the Arboretum was for the social good, but Downing has not offered sufficient reason why the economic costs incident to the expulsion of the surface waters should be borne by Zannini rather than Downing, who undertook this project for profit.
It is fundamental that equity has jurisdiction only when there is no adequate remedy at law, but the abatement of a nuisance is a subject matter over which equity always has jurisdiction.[4] Where the injury is real and continuing, equity considers the remedy of damages at law to be inadequate and will take jurisdiction to abate the nuisance. Wilmont Homes,Inc. v. Weiler, 202 A.2d 576, 579 (Del. 1964). Further, once a right to relief in equity has been determined to exist, the powers of the court are broad and the means flexible to shape and adjust the precise relief to be granted so as to enforce particular rights and liabilities legitimately connected with the subject matter of the action. Wilmont, at 580. The court has the ability to adapt the relief granted to the requirements of the case so as to give to the parties that to which they are entitled. Id.
In Wilmont, surface water periodically collected in the plaintiffs' yards and seeped into their basements as a result of the defendant developer's negligent grading of the land adjacent to their lots. The defendant attempted to remedy the situation by re-grading the land, but this did not work. Then, the defendant proposed to install an open grass drainage scale to pass off the surface water to a lower level. The plaintiffs rejected this proposal since it would deprive them of the use of approximately half of their back yards and traverse their properties with an open drainage ditch. Wilmont, 202 A.2d at 578. During continuing negotiations, the plaintiffs suggested the installation, in accordance with their engineering plans, of a different drainage plan for the elimination of the surface water. This was rejected by the Defendant as being too expensive.Wilmont, at 578-579. Thus, an impasse resulted leading to an action for abatement of the nuisance. After the lawsuit passed through the Delaware legal system, a Vice Chancellor issued an order directing the Defendant to abate the nuisance in accordance with an engineering plan submitted by the Plaintiffs. Wilmont,
202 A.2d at 579.
The Delaware Supreme Court affirmed the trial court's adapting the relief granted to the requirements of the case.Wilmont, at 580. The trial judge held a full hearing and permitted all parties to produce evidence upon the means of insuring the preservation of the plaintiffs' right. The Defendant as well as the Plaintiffs were given an opportunity to suggest the means. Subsequently, the judge determined that of all the proposals suggested, the plan finally adopted was the only one which would accomplish the necessary result. As the Delaware Court wrote: "Under the circumstances, we think the [judge] in his order adapted the relief to the circumstances. Indeed, it is difficult to imagine what other form the relief could have taken." Wilmont, at 580.
The flow of excess water which Zannini complained of to Downing in 1979 continues today even after the installation of the drainage system by Downing. The existence for ten years of a recurrent, albeit cyclical and seasonal nuisance, convinces the Court that the injury is real and continuing with no remedy at law. Here also, the destructive invasion to Zannini's interest in his land warrants equitable intervention. This Court orders the defendant to install an artificial drainage system on Zannini's land sufficient to afford relief from the nuisance, and the defendant shall pay the necessary and reasonable costs associated therewith.
The Court does not find Downing's conduct contemptuous. Defendant has made attempts to rectify the situation and there is nothing in the record to indicate efforts made in anything other than good faith.
[1] The abutting properties have a common boundary of approximately 90 feet. During the development, Downing extensively graded and excavated the land which had been covered with vegetation prior to the project. Downing filled the portion of land lying along its southern boundary and Zannini's northern boundary. Downing also constructed a retaining wall, composed of wooden timbers, along the common boundary.
[2] During the trial, Zannini testified that he had never experienced a problem with excess water on his land or in his house prior to the Arboretum construction. He testified that in the spring of 1979, early in the construction project, he complained of the silting, erosion and puddles in his yard to Downing's project superintendent who assured him that the problem would be solved. The problem was not corrected but increased, rather worsened. On July 19, 1979, Zannini informed Downing by registered mail that due to Downing's changing the grade of its land, there was considerable flooding in his backyard during rainfall and the danger of seepage in his basement. He advised Downing that the construction superintendent had assured him that upon completion of the construction the grade of land would be changed to eliminate the excess water. In this same letter, Zannini put Downing on notice that he would assert his rights if Downing did not rectify the problem.
[3] However, the resulting construction was not the same as shown on the grade plans. Instead of grading toward the entire southern boundary of the Arboretum from Arbor Drive, the grade was altered by the wall Downing constructed along the south border. Drainage from roofs, pavement, and grass areas was directed to the timber wall without any provision to prevent the flooding of Zannini's property. The grade change directed storm runoff from a high point 150 feet east of Zannini's property with additional runoff from the roadway of Arbor Drive. This water flows westerly until it is blocked by trees and stones in some of the Arboretum backyards. This resulted in a discharge toward Zannini's property which produced the flooding of his property.
[4] In Butler, the court referred to Sweet v. Conley,20 R.I. 381, 39 A. 326 (1898), where it recognized that the invasion of one's property by surface waters can be a nuisance, no different from an invasion by noise, noxious vapors, or the like.Butler, 115 R.I. at 273, N. 6, 341 A.2d at 740, n. 6. "[T]o wrongfully and illegally cause the surface water of a street to collect and remain in front of one's premises, so as to materially injure and damage him in the use and enjoyment thereof, is a nuisance * * *." Sweet v. Conley, 20 R.I. at 385, 39 A. at 328.