RENDERED:  SEPTEMBER 5, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1225-MR

TOM WHITE AND
MARY J. WHITE                                                    APPELLANTS


                    APPEAL FROM NELSON CIRCUIT COURT
v.              HONORABLE CHARLES C. SIMMS, III, JUDGE
                          ACTION NO. 22-CI-00521


DONALD VINCENT CHASE AND
JENNIFER GALE ALLMENDINGER,
CO-EXECUTORS OF THE ESTATE OF
DOROTHY F. HILL                                                    APPELLEES


                              OPINION
                             AFFIRMING

                        ** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; EASTON AND A. JONES, JUDGES.

JONES, A., JUDGE:  Tom and Mary J. White appeal a September 25, 2024 order

and judgment of the Nelson Circuit Court entered in favor of the above-captioned

appellees ("the Estate").  In sum, the circuit court determined the Estate was not

liable for damage to the Whites' property allegedly caused by a pond on the Estate's adjacent tract. Upon review, we affirm.

**BACKGROUND**

The Estate and the Whites own adjoining properties in Nelson County, Kentucky, on Nat Rogers Road. The Estate's tract (located at 4895 Nat Rogers Road) has a small pond ("the upper pond") close to the road. The Whites' tract (located at 4837 Nat Rogers Road) has a small pond in the front yard ("the lower pond") slightly downhill from the upper pond. The two ponds are separated by a berm several yards wide. The lower pond occasionally overflows into the Whites' front yard and onto their driveway, causing damage.

This litigation involves a fifteen-inch-wide, 50-foot-long, corrugated, plastic pipe that connects and is buried between the two ponds. The pipe's inlet is located a little less than a foot beneath the ground surrounding the upper pond. When the upper pond's water level rises enough to flow into the pipe, water from the upper pond is carried down the pipe and drained into the lower pond. The Whites filed suit against the Estate in Nelson Circuit Court, alleging that but for the existence of this pipe their lower pond would not overflow and damage their front lawn and driveway. The Estate, in turn, sought a binding declaration that no existing condition of its tract, including the pipe, supplied a basis for holding it legally responsible for any damages to the Whites' property. This matter was tried

without a jury on September 10, 2024.  Only two witnesses testified:  Tom White (who co-owns the White tract) and Donald Vincent Chase (one of the two co-executors of the Estate).  The circuit court ultimately found in favor of the Estate, and this appeal followed.  Additional facts will be discussed as necessary in our analysis below.

## STANDARD OF REVIEW

Because this is an appeal from a bench trial, our standard of review is governed by Kentucky Rule of Civil Procedure (CR) 52.01.  Under CR 52.01, the trial court makes specific findings of fact and separately states its conclusions of law.  Further, "[f]indings of fact, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."  CR 52.01.  "If the trial judge's findings of fact in the underlying action are not clearly erroneous, *i.e.*, are supported by substantial evidence, then the appellate court's role is confined to determining whether those facts support the trial judge's legal conclusion."  *Barber v. Bradley*, 505 S.W.3d 749, 754 (Ky. 2016) (quoting *Commonwealth v. Deloney*, 20 S.W.3d 471, 473-74 (Ky. 2000)).  "However, while deferential to the lower court's factual findings, appellate review of legal determinations and conclusions from a bench trial is *de novo*."  *Id*. (citation omitted).

ANALYSIS

In Kentucky, the owner of an upper tract of land may divert the flow of water onto a lower tract without liability if the diversion is reasonable. *See Walker v. Duba*, 161 S.W.3d 348, 350 (Ky. App. 2004). Stated another way, "although a lower owner is bound to accept natural drainage from an upper owner, the rights of the upper owner are not unlimited and . . . the upper owner may not unreasonably change the natural flow of water or cause it to collect and be cast upon the lower estate at a point where it had not previously flowed or in an increased volume or accelerated rate of flow so as to [cause] substantial damage to the lower owner." *Taylor v. Carrico*, 528 S.W.2d 694, 696 (Ky. 1975).

In determining "reasonableness," the following factors must be considered and balanced: (1) the necessity for the drainage; (2) whether reasonable care was taken by the dominant estate to avoid unnecessary injury to the land receiving the burden; (3) whether the utility or benefit accruing to the land drained reasonably outweighs the gravity of the harm resulting to the land receiving the burden; and, (4) whether the nature of diversion used by the dominant estate was "accomplished by reasonably improving and aiding the normal and natural system of drainage according to its reasonable carrying capacity, or if, in the absence of a practicable natural drain, a reasonable and feasible artificial drainage system is adopted." *Klutey v. Commonwealth, Dep't of*

*Highways*, 428 S.W.2d 766, 769-70 (Ky. 1967) (quoting *Enderson v. Kelehan*, 226 Minn. 163, 32 N.W.2d 286, 289 (1948)). A proper consideration of these factors requires a balancing analysis to be performed "in main part consisting of weighing the reasonableness of the use of the land drained (or the 'utility' of such use) against the gravity of the harm to the land receiving the burden of the drainage." *Commonwealth, Dep't of Highways v. Baird*, 444 S.W.2d 541, 543 (Ky. 1969). This balancing test and the ultimate question of reasonableness are matters for the factfinder. *Commonwealth, Dep't of Highways v. S & M Land Co., Inc.*, 503 S.W.2d 495, 497 (Ky. 1972).

With that framework in mind, we turn to the evidence that the circuit court chose to credit. That evidence originated from the Estate's co-executor, Donald Vincent Chase, Ph.D, P.E. Dr. Chase is a professor of civil and environmental engineering at the University of Dayton, Ohio. At trial, he provided expert testimony consistent with a May 2023 hydrologic analysis report that he prepared for purposes of this litigation. He also testified regarding his personal knowledge of the adjoining tracts and the ponds at issue: the Estate's decedent was his mother; both tracts were owned by his family prior to when the Whites took ownership (in 2011) of the lower pond tract; and in 1981, when he was roughly twenty years old and no residence existed on the Whites' tract, he had assisted his stepfather in the construction of the lower pond.

In his extensive report, Dr. Chase identified the watershed[1] associated with the Estate/White hydrologic system, an area of approximately 11.75 acres. He located two subwatersheds in that area, the first of which was a 9.41-acre zone ("Subarea A") that included the upper pond inside the bottom of its boundary[2] and largely consisted of a somewhat narrow area stretching above the upper pond, across and beyond Nat Rogers Road. Consistently with his report, Dr. Chase testified that when it rains, runoff from Subarea A flows downhill from the top of this zone; becomes channeled along Nat Rogers Road and eventually into a culvert underneath it; is ultimately deposited into the upper pond; and that the vast majority of the water in the upper pond originates from that process. Parenthetically, the Estate and its predecessors in title did not construct the culvert. From all indications, the culvert was constructed by the Department of Highways.

As indicated, the upper pond is at a higher elevation than the lower pond and the Whites' front yard. Dr. Chase testified that if the upper pond was artificial, it did not appear to have been designed as a runoff mitigation basin. He

---

[1] Dr. Chase's hydrologic report described a "watershed" as "a topographically defined area such that all runoff (rainfall that is not infiltrated) from within the watershed finds its way to a single outlet. In other words, the elevation of the ground defines the watershed. In hilly areas ridges along the hills typically act as watershed boundaries. Precipitation that falls within the watershed is directed, again by ground elevations, to gullies and – if the watershed is large enough – to a well-defined channel."

[2] The pictures and maps of the land at issue in this matter indicate elevations but do not indicate cardinal directions.

did not know who connected the two ponds with the pipe, or when that pipe was installed, only that it was present before the Whites assumed ownership of their tract. He also did not know what the exact natural topography of the land was prior to the existence of the culvert, the roadway, or the two ponds. No evidence was introduced by either party in that respect.

However, Dr. Chase added that the upper pond still behaved as a runoff mitigation basin to an extent because it had a small amount of additional water storage space, *i.e.*, available freeboard[3] of .9 feet. He testified that removing the fifteen-inch-wide underground plastic pipe would cause water from the upper pond to overflow downhill into the Whites' property; and that if the pipe was perforated as he suspected, it likely provided a small benefit to the Whites' property by containing or impeding a small amount of the upper pond's overflow while transporting it to the lower pond.

Dr. Chase also opined that the lower pond was susceptible to overtopping and flooding even if it was *not* exposed to the Subarea A runoff water. In that vein, he identified the second subwatershed associated with the Estate/White hydrologic system, a 2.33-acre zone ("Subarea B") that excluded the upper pond, but included and drained directly and exclusively into the lower pond.

---

[3] Dr. Chase's hydrologic report defines "freeboard" as "the vertical distance between the water level in the pond and the elevation at which the pond begins to overflow."

Dr. Chase noted that because the lower pond had very limited capacity to store additional water, *i.e.*, available freeboard of only .3 feet, it was prone to overflowing even during small rainstorms.

Most importantly, it was Dr. Chase's expert opinion based upon the existing topography of the land, what he believed was otherwise the natural topography of the land, and the unchallenged data and methodologies set forth in his report, that even if the two ponds were filled in and the pipe connecting them was removed, it would have no bearing upon the Whites' purported damages:

> CHASE:  The natural topography, the overall lay of the land, that is the lay of the land and topography created by nature, causes water on these eleven acres to run off, and it does run through some several man-made elements, but eventually it's going to run through the front yard of the Whites' property regardless of whether those elements are there or not.
>
> COUNSEL:  So, the fact that there's a large pipe running from your pond to Mr. White's pond is irrelevant as to the damage, as to his pond overflowing?
>
> CHASE:  That is correct, that the natural lay of the land is going to cause water, and you can see from the topography, to run through the front yard of the Whites' property.

September 10, 2024 trial at 10:04:38 – 10:05:30.

As discussed, the circuit court dismissed the Whites' monetary claims and held that, going forward, the Estate would not be responsible for damages flowing from the upper pond so long as there are no changes to the upper pond and

-8-

its current drain. Turning to the specifics of its order, the circuit court found with respect to the first *Klutey* factor listed above that there was a reasonable necessity for the drainage flowing from the upper pond, through the pipe, into the lower pond. This was so, it explained, because the upper pond and the pipe served the legitimate purpose of absorbing some of the water running down the watershed from Subarea A that would otherwise reach the Whites' property. Regarding the second factor – whether reasonable care was taken by the dominant estate to avoid unnecessary injury to the land receiving the burden – the circuit court explained:

> In this case, the water from Subarea A will inevitably drain onto the [Estate] property and subsequently to the White property. This Court believes that the upper pond is providing White with a "slight benefit" by taking some of that water. This finding is based on Chase's uncontroverted expert opinion. In addition, Chase's report further determined that if the [Estate] pond were filled-in and removed, the "maximum water levels in the White pond [would be] greater." *See* Petitioners' Exhibit 5.[4] It must also be noted that when this lower pond was constructed, there was no residence on White's property. As a result, there would have been no consideration about water damaging a residential driveway.

With respect to the remaining pair of *Klutey* factors, the circuit court continued:

> The third factor is whether "the utility or benefit accruing to the land drained reasonably outweighs the gravity of the harm resulting to the land receiving the burden." Once again, the water from Subarea A will

---

[4] "Petitioners' Exhibit 5" is Dr. Chase's hydrologic report.

inevitably drain onto the [Estate] property and thereafter to the White property. If the [Estate] heightened the dam to prevent it from overtopping, the evidence indicates that the water would then back up onto Nat Rogers Road. Meanwhile, this Court recognizes that White has sustained some damages from the overflowing pond. However, it finds that said damages are considerably lower than the receipts totaling $15,416.10. As grounds, this Court believes that a portion of each bill is attributable to overflow while another portion is unrelated. The best example is the $6,000.00 bill for "paving over old blacktop and widening 2 areas." After reviewing the photographs introduced herein, this Court believes that only a portion of the driveway sustained damages. White also complained that debris blocked the drainage pipe.[5] However, there appears to be tree related debris coming from both Subareas A and B. The receipts also indicate that 1,050 rolls of sod have been laid on White's property. Nevertheless, this Court finds it hard to believe that all of those rolls are related to overflow damage.

The fourth factor is whether the upper pond is "reasonably improving the normal and natural system of drainage" and it is "a reasonable and feasible artificial drainage system." This Court finds that there is a "slight benefit" to White. As grounds, some of the runoff from Subarea A will be absorbed by the upper pond. In addition, if the upper pond was removed, the maximum level in the lower pond would be greater.

In sum, the circuit court discredited much of the Whites' evidence

relating to what they represented was the extent of their damages stemming from

---

[5] The lower pond had a separate plastic drainage pipe to mitigate its own overflow. As the circuit court's order indicates, the Whites claimed that tree-related debris flowing down from the upper pond's drainage pipe would clog this other pipe.

the lower pond overflowing onto their property. But regardless, it deemed the full extent of the Whites' claimed damages non-compensable after giving weight to Dr. Chase's expert evidence, which disclaimed that any artificial condition on the Estate's tract had caused the lower pond to overflow onto the Whites' property. Consistently with that premise, the circuit court essentially held that the Estate's tract was, if anything, a "slight benefit" to the Whites.

On appeal, the Whites' arguments appear to be three-fold. First, they contend the circuit court erred because it relied upon Dr. Chase's expert evidence, rather than upon Tom White's contrary testimony that in his lay opinion the pipe connecting the upper and lower ponds *does* cause the lower pond to overflow and damage their property. This contention is meritless. "As the factfinder, it is the trial court's prerogative to make findings of fact according to its own weighing of the evidence." *Cabinet for Health & Fam. Servs. v. L.G.*, 653 S.W.3d 93, 101 (Ky. 2022). It was also the circuit court's "prerogative to weigh the credibility of the various experts and decide whose opinions to accept and whose to reject." *Miller ex rel. Monticello Banking Co. v. Marymount Med. Ctr.*, 125 S.W.3d 274, 278 (Ky. 2004).

Second, the Whites contend "[t]he court allowed Mr. Chase to testify as an expert witness over Appellants objections that he had a strong financial interest in the outcome of the case." This contention is also meritless. To start, the

-11-

Whites do not indicate when they objected to the admissibility of Dr. Chase's testimony, which is unsurprising: We have reviewed the entirety of the trial record, and the Whites made no such objection. In any event, their concerns regarding Dr. Chase's "strong financial interest in the outcome of the case" at most affected the evidentiary weight of his testimony, not its admissibility. Dr. Chase's testimony and expert opinions qualified as substantial evidence; weighing the evidence was the circuit court's prerogative; and, in its dispositive order, the circuit court carefully considered Dr. Chase's potential biases and nevertheless chose to assign his testimony weight. To that point, on page three of its September 25, 2024 order, the circuit court explained:

> Throughout the trial, White was critical of Chase's expert opinions based upon Chase having a financial stake in this litigation. Although this Court would have obviously preferred testimony from a disinterested expert, it was impressed with Chase's testimony and opinions, especially considering White's failure to call any expert to *rebut* same.

(Emphasis added.)

Lastly, the Whites contend the circuit court acted unfairly toward them if it based any aspect of its judgment upon the fact that they did not also have an expert witness. Continuing in this vein, the Whites note that they also retained an expert, and that their expert provided a deposition. However, the Whites miss the obvious point. The circuit court did not fault them for failing to retain an

-12-

expert. The circuit court did not fault them for failing to have their expert provide a deposition.[6] As emphasized above, the circuit court faulted them for failing to *rebut*, *at trial*, any specific aspect of Dr. Chase's expert testimony with expert testimony of their own. That their expert could have (but did not) give rebuttal evidence at trial is not a cognizable claim of reversible error.

### CONCLUSION

The Nelson Circuit Court's judgment in favor of the Estate was supported by substantial evidence and was not clearly erroneous. CR 52.01. We therefore AFFIRM.

ALL CONCUR.

BRIEF FOR APPELLANTS:

Daniel Carroll Kelly
Springfield, Kentucky

BRIEF FOR APPELLEES:

Matthew E. Hite
Bardstown, Kentucky

---

[6] Assuming the Whites' expert provided a deposition, it is not part of the record; the Whites never designated it to be part of the record; and as indicated, it – like their expert – was never a source of evidence at trial.