DAVID K. ARMSTRONG AND MARY JANE ARMSTRONG, HIS WIFE, PLAINTIFFS-RESPONDENTS, v. THE FRANCIS CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT, AND GEORGE O. KLEMP AND C. KLEMP, HIS WIFE, DEFENDANTS-RESPONDENTS.

Argued December 19, 1955—Decided January 16, 1956.

Mr. *Samuel A. Larner* argued the cause for appellant (*Messrs. Gruen & Goldstein,* attorneys; *Mr. Larner,* of counsel).

Mr. *David K. Armstrong* argued the cause for plaintiffs-respondents.

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J. The Chancery Division, after trial, entered a final judgment against the defendant, the Francis Corporation. Francis appealed to the Appellate Division, and we certified the appeal here on our own motion.

A small natural stream rose in Francis' 42-acre tract, which lies immediately south of Lake Avenue in Rahway. The stream flowed in an northerly direction 1,200 feet across the Francis lands through a seven-foot box culvert under Lake Avenue and emptied into Milton Lake, 900 feet north of the avenue. It was the natural drainway for the larger 85-acre area south of Lake Avenue which includes the Francis tract.

Francis stripped its tract and erected 186 small homes thereon in a development known as Duke Estates, Section 2. It also built some 14 houses on an adjacent small tract known as Duke Estates, Section 1, lying in another drainage area. It constructed a drainage system of streets, pavements, gutters, ditches, culverts and catch basins to serve both developments. The system emptied into a corrugated iron pipe laid by Francis below the level of the natural stream bed on its lands. The pipe followed the course of the stream bed to the box culvert under Lake Avenue, although deviating from the course at some places. The pipe was covered

with fill on Francis' tract and all evidence of the natural stream there has disappeared.

The drainage of the original 85 acres was thus augmented not only by the drainage of some 2½ acres of the Duke Estates, Section 1, but also by waters percolating into the joints of the pipe where it lay below the level of the water table of the Francis tract. The pipe joints were expressly designed to receive such percolating waters, and, to the extent that the percolation lowered the level of the water table, the result was to provide a drier terrain more suitable to housing development.

Where the stream passes north of Lake Avenue en route to Milton Lake after leaving the box culvert it remains largely in its natural state and forms the boundary line between the residential tracts of the plaintiffs Armstrong and the defendants Klemp. The Klemps were made parties defendant by Francis' cross-claim but prevailed thereon and were allowed the same relief as the Armstrongs. The stream passes through a 36-inch culvert under the Klemp driveway and thence, across lands of the Union County Park Commission, to the Lake.

The Francis improvement resulted in consequences for the Armstrongs and the Klemps fully described by Judge Sullivan in his oral opinion as follows:

"Now the stream as it emerges from the underground pipe goes under Lake Avenue and then flows past and through the Armstrong and Klemp properties is no longer the 'babbling brook' that Mr. Klemp described. Now there is a constant and materially increased flow in it. The stream is never dry. The water is now discolored and evil smelling and no longer has any fish in it. A heavy deposit of silt or muck up to eighteen inches in depth now covers the bottom of the stream. After a heavy rainstorm the stream undergoes a remarkable change for several hours. All of the upstream rain water that used to be absorbed or held back is now channeled in undiminished volume and at great speed into this stream. This causes a flash rise or crest in the stream, with a tremendous volume of water rushing through at an accelerated speed. As a result, the stream has flooded on several occasions within the last year, although this was unheard of previously. More distressing, however, is the fact that during these flash situations the body of water moving at the speed it does tears into the banks of the brook particularly

where the bed may turn or twist. At a point even with the plaintiff's [Armstrong] house the stream makes a sharp bend. Here the effect of the increased flow of water is most apparent since the bank on plaintiff's side of the stream has been eaten away to the extent of about ten feet. This erosion is now within fifteen feet of the Armstrong septic tank system. It is difficult to say where it will stop, where the erosion will stop. The silting has, of course, · raised the bed of the stream up to eighteen inches in places and the raising of the stream results in water action against different areas of the bank so that the erosion problem while unpredictable is ominous. The eating away of the banks in several places has loosened rocks or boulders which have been rolled downstream by the force of the water. Those stones, however, as they rolled through the Klemp culvert cracked and broke the sides and bottom of the culvert and the water is now threatening to undermine the entire masonry. There is no doubt but that the defendant's activities have caused all of the condition just related.

A matter of some concern is that defendant's housing development occupies only about one-half of the area which drains into this brook. At the present time there is a forty acre undeveloped section to the south of the defendant and it is reasonable to assume that it, too, will be improved and built upon at some future time. Defendant's underground trunk sewer was built to accommodate any possible runoff from this tract. If and when that section is developed, Armstrong and Klemp will have that much more erosion, silting and flooding to deal with."

Judge Sullivan concluded that the Armstrongs and the Klemps were plainly entitled to relief in these circumstances and "that the only sensible and permanent solution to the problem is to pipe the rest of the brook," that is, from the culvert outlet at Lake Avenue the entire distance to Milton Lake. A plan for that purpose had been prepared by Francis' engineer and approved by the Armstrongs and the Klemps at a time when efforts were being made to compromise the dispute before the trial. The final judgment orders Francis, at its expense, forthwith to proceed with and complete within 60 days the work detailed on that plan. The Union County Park Commission has given its formal consent to the doing of the work called for by the plan on its lands.

The important legal question raised by the appeal is whether the damage suffered by the Armstrongs and the Klemps is *damnum absque injuria,* namely, merely the non-actionable consequences of the privileged expulsion by Francis

of waters from its tract as an incident to the improvement thereof. Francis argues, however, that, even if the injuries caused are actionable, Judge Sullivan's findings are against the weight of the evidence, that there was prejudicial error in the admission of evidence dealing with the offer of compromise, and that the relief granted was excessive, improper and unwarranted. We find no merit in any of these contentions.

The findings are fully and amply supported by competent evidence. The controverted questions lie principally in the opposing interpretations of the facts by the expert witnesses, and we are not persuaded that Judge Sullivan should have accepted the opinion of the Francis experts in preference to the opinion of the expert who testified for the Armstrongs and the Klemps. And there is nothing in the record as we read it to suggest that Judge Sullivan weighed the evidence of the offer of compromise in reaching his conclusions. His finding that the completion of the piping to Milton Lake was the sensible thing to do in no wise refers to the compromise offer, and in the context of his oral opinion that finding seems plainly to be predicated upon his view of what was needful to save the Armstrongs and the Klemps from further harm. The prescription in the judgment that the piping plan developed by Francis' own engineer be completed does not point to a contrary conclusion. Having decreed that piping was necessary to afford adequate relief, ordering its accomplishment according to the plan which reflected Francis' own concept of that need was wholly logical. Like considerations also answer Francis' other point that the relief allowed was excessive,—or, at least, point up the absence of any basis for the intrusion of appellate judgment into the question of its reasonableness.

Turning, then, to the basic question for decision, appellant grounds its argument upon the following statement of the Appellate Division in *Yonadi v. Homestead Country Homes*, 35 *N. J. Super.* 514, 521 (1955):

"While the New Jersey cases do not deal with the matter explicitly, we conclude that where surface water is concentrated through a drain

or other artificial means and is conducted to some place substantially where it otherwise would have flowed, the defendant will not be liable even though by reason of improvements he has made in the land, the water is brought there in larger quantities and with greater force than would have occurred prior to the improvements. The policies underlying the general rule come to bear here. What reasonably could the upland proprietor or occupant do in the present case with this excess water? Rather than require him to dispose of it—and so perhaps require him to secure the cooperation of a number of lowland properties through which the water must eventually be brought—the burden is cast on each lowland proprietor to protect his own land."

We might summarily dispose of this point against the appellant upon the ground that more than the surface water drained from the 85-acre tract is involved here. Appellant has augmented the volume of water passing through the Lake Avenue culvert with water from another drainage area and with water percolating into its pipe where the level of the natural water table on its tract is higher,—and so the cited proposition would not in any event apply. See *Town of Union v. Durkes,* 38 *N. J. L.* 21 (*Sup. Ct.* 1875). But, because we do not agree that the quoted proposition, in the form stated, which makes no allowance for differences in factual situations, is or should be the law governing the liability of the landowner who alters the flow of surface waters with resulting material harm to other landowners, we shall treat the case as if only the disposal of surface water from the 85-acre tract was involved and determine appellant's point upon that premise.

In their article "Interferences with Surface Waters," 24 *Minn. L. Rev.* 891, 899 (1940), Professor Kinyon and Mr. McClure have convincingly demonstrated that there was no true common law of surface waters and that the law in that respect has been largely developed since 1850, both in England and in the United States.

The casting of surface waters from one's own land upon the land of another, in circumstances where the resultant material harm to the other was foreseen or foreseeable, would appear on the face of it to be tortious conduct, as actionable where the consequences of an unreasonable use of

the possessor's land, as in the case of the abstraction or diversion of water from a stream which unreasonably interferes with the use of the stream below, *Prosser, Torts* (1951), *p.* 586, and as in the case of the unreasonable use of percolating or subterranean waters, *Meeker v. City of East Orange,* 77 *N. J. L.* 623 (*E. & A.* 1909), and as in the case of artificial construction on one's land which unreasonably speeds the waters of a stream past one's property onto that of an owner below, causing harm, *Kidde Manufacturing Co. v. Bloomfield,* 20 *N. J.* 52 (1955); *Hughes v. Knight,* 33 *N. J. Super.* 519 (*App. Div.* 1955). Yet only the courts of the states of New Hampshire and Minnesota have expressly classified the possessor's liability, where imposed, for harm by the expulsion of surface waters to be a tort liability. Those courts have evolved the "reasonable use" rule laying down the test that each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, but incurs liability when his harmful interference with the flow of surface waters is unreasonable. *Franklin v. Durgee,* 71 *N. H.* 186, 51 *A.* 911, 58 *L. R. A.* 112 (*Sup. Ct.* 1901); *Sheehan v. Flynn,* 59 *Minn.* 436, 61 *N. W.* 462, 26 *L. R. A.* 632 (*Sup. Ct.* 1894); 24 *Minn. L. Rev., supra,* 909.

All other states have treated the legal relations of the parties as a branch of property law—that is, have done so, if we emphasize only the language of the decisions and ignore the actual results reached. Two rules have been evolved which, in their statement, are directly opposed, for under one the possessor would not be liable in any case and under the other he would be liable in every case. But an analysis of the results reached under both rules shows that neither is anywhere strictly applied. The first rule, purportedly applicable in our own State, stems from the view that surface waters are the common enemy. The "common enemy" rule emphasizes the possessor's privilege to rid his lands of surface waters as he will. That rule "is, in substance, that a possessor of land has an unlimited and un-

restricted legal privilege to deal with the surface water on his land as he pleases, regardless of the harm which he may thereby cause others." 24 *Minn. L. Rev., supra,* 898. For New Jersey decisions see *Earl v. DeHart,* 12 *N. J. Eq.* 280 (*E. & A.* 1856); *Fitz-Patrick v. Gourley,* 104 *N. J. Eq.* 281, (*Ch.* 1929); *Nathanson v. Wagner,* 118 *N. J. Eq.* 390 (*Ch.* 1935), and other cases collected in *Yonadi v. Homestead Country Homes, supra.* The other rule, borrowed from the civil law of foreign nations and called the "civil law" rule, emphasizes not the privileges of the possessor but the duties of the possessor to other landowners who are affected by his expulsion of surface waters from his lands. That rule is to the effect that "a person who interferes with the *natural* flow of surface waters so as to cause an invasion of another's interests in the use and enjoyment of his land is subject to liability to the other." 24 *Minn. L. Rev., supra,* 893.

The quoted statement from the *Yonadi* opinion implies that what Francis did here was absolutely privileged, which is the clear import of the common enemy rule. But our decisions have invariably refused to apply the rule according to its letter where it works injustice. Typical departures are found in *Field v. Inhabitants of West Orange,* 36 *N. J. Eq.* 118 (*Ch.* 1882), affirmed 37 *N. J. Eq.* 600 (*E. & A.* 1883); *Weisberger v. Maurer,* 9 *N. J. Misc. R.* 117 (*Cir. Ct.* 1930), affirmed 109 *N. J. L.* 273 (*E. & A.* 1932); *Davison v. Hutchinson,* 44 *N. J Eq.* 474 (*Ch.* 1888); *Smith v. Orben,* 119 *N. J. Eq.* 291 (*Ch.* 1935); see also *Schnitzius v. Bailey,* 48 *N. J. Eq.* 409 (*Ch.* 1891). Nor have states which are said to follow the civil law rule held that the possessor may not under any circumstances rid his lands of surface water without incurring liability if harm is caused to another. In sum, the courts here and elsewhere, in terms of results, have actually come out at the "reasonable use" doctrine, *Prosser, supra.* Professor Kinyon and Mr. McClure have summarized the course of the decisions as follows (24 *Minn. L. Rev., supra, pp.* 916, 920, and 913):

"From the rationale of the common enemy rule, it would seem that a possessor of land has an unlimited privilege to rid his land of the surface water upon it or to alter its course by whatever means he wishes, irrespective of the manner of doing it or the harm thereby caused to others. However, in substantially all of the jurisdictions purportedly committed to that rule, the courts have refused to go that far. Most of these courts have developed a qualifying rule which is, in substance, that a possessor of land is not privileged to discharge upon adjoining land, by artificial means, large quantities of surface water in a concentrated flow otherwise than through natural drainways, regardless of the means by which the surface water is collected and discharged. The scope of this qualifying rule varies from jurisdiction to jurisdiction, but it has been adopted in one form or another * * *.

In jurisdictions purportedly committed to the civil law rule, one would expect from the rationale of that rule to find that a possessor has no privilege, under any circumstances, to interfere with the surface water on his land so as to cause it to flow upon adjoining land in a manner or quantity substantially different from its natural flow. An examination of the cases in these jurisdictions, however, reveals that the courts have refused to follow the rationale of the rule to that extent. In most of these jurisdictions the courts have recognized that a possessor must have a privilege, under certain circumstances, to make minor alterations in the natural flow of surface water where necessary to the normal use and improvement of his land, even though such alterations cause the surface water to flow upon adjoining land in a somewhat unnatural manner. This is especially true where the possessor disposes of the surface water by depositing it in existing natural drainways. Consequently, the courts * * *, with variations from state to state, have held that a possessor has a limited privilege to discharge surface water on other lands, by artificial means in a non-natural manner * * *."

The authors conclude:

"* * * [Thus] even though the broad principle of reasonable use has not made much headway as an articulate basis of decision, substantially all of the jurisdictions which purport to follow the civil law or common enemy rules have engrafted upon them numerous qualifications and exceptions which, in actual result, produce decisions which are not as conflicting as would be expected, and which would generally be reached under the reasonable use rule."

We therefore think it appropriate that this court declare, as we now do, our adherence in terms to the reasonable use rule and thus accord our expressions in cases of this character to the actual practice of our courts. Indeed, Judge Sullivan did so in his oral opinion below when he pronounced his judgment as based upon his finding that what

Francis did was not "done in the reasonable use of his [its] land," relying for authority upon the decision of the former Court of Chancery in *Smith v. Orben, supra*. And it is significant of the true state of the law that the *Restatement on Torts, sec.* 833, has adopted the reasonable use test as the rule actually prevailing.

 The rule of reasonableness has the particular virtue of flexibility. The issue of reasonableness or unreasonableness becomes a question of fact to be determined in each case upon a consideration of all the relevant circumstances, including such factors as the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter. 93 *C. J. S., Waters,* § 116; *Enderson v. Kelehan,* 226 *Minn.* 163, 32 *N. W. 2d* 286 *(Sup. Ct.* 1948). It is, of course, true that society has a great interest that land shall be developed for the greater good. It is therefore properly a consideration in these cases whether the utility of the possessor's use of his land outweighs the gravity of the harm which results from his alteration of the flow of surface waters. *Sheehan v. Flynn, supra.* But while today's mass home building projects, of which the Francis development is typical, are assuredly in the social good, no reason suggests itself why, in justice, the economic costs incident to the expulsion of surface waters in the transformation of the rural or semi-rural areas of our State into urban or suburban communities should be borne in every case by adjoining landowners rather than by those who engage in such projects for profit. Social progress and the common well-being are in actuality better served by a just and right balancing of the competing interests according to the general principles of fairness and common sense which attend the application of the rule of reason.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For reversal*—None.