Gaots, J.
In 1953, the plaintiffs, Raymond A. Brousseau and Alfreda M. Brousseau (the “Brousseaus”), purchased a lot with a single-family home at 153 Highland Street in Southbridge — Lot 88. The lot was located at the base of a natural drainage kettle adjoining a wetlands area. After purchasing the property, they cleared the area behind the house and seeded it to create a lawn that reached nearly to the *183 banking of the nearby brook, known aptly as Nuisance Brook. For many years, the lawn was relatively dry, certainly dry enough to be used by his children. Then, after developments were built on nearby Pinedale and Oak Streets, at elevations above their home, the drainage onto his land appeared to increase, and his lawn become wet and spongy in all but the driest of seasons and flooded during heavy rains. As a result, the Brousseaus file suit against the Town of Southbridge (the ’’Town”) claiming that the Town created a nuisance by failing to prevent the flow of surface water onto their property.[1]
All parties waived their right to a jury trial, and the two day trial commenced before me on January 21, 1998, beginning with my viewing of the property at issue. Based on that view, and the testimony and exhibits offered at trial, I make the following findings of fact and conclusions of law.
FINDINGS OF FACT
When the Brousseaus purchased Lot 88 in 1953, it was located, as it is today, at the end of Highland Street, at the base of a natural kettle. While Highland Street was developed in 1953, little else around it was. The area east and southeast of the property, which sloped down into Lot 88 and the area immediately around it, was entirely undeveloped — an open, naturally wooded area. The area south and southwest of Lot 88, including Lot 89, a 2V2 acre lot at the very end of Highland Street, was largely wetlands, unapproved for development. In 1982, the Brousseaus purchased Lot 89 which, along with the wetlands area to its south and southwest, remains undeveloped today.
Lots 88 and 89 are at roughly the low elevation point of a natural drainage area. Surface water naturally falls from the hills at higher elevations to its east and south, and finds its destination in or near these two lots, either in the wetlands or in Nuisance Brook. The water that enters Nuisance Brook in this watershed flows through Lots 89 and on the easterly side of Lot 88 into a pond two lots north of Lot 88, where it eventually feeds into a reservoir further north.
To the east of this natural drainage area, adjacent to it, lies a separate natural drainage area, which is where surface waters naturally flow from the higher elevations to the west and southwest. Although these two natural drainage areas are adjacent to each other, they are quite separate and distinct in terms of the origin of their surface water, and are not hydraulically connected. Flooding in one area has little effect on the other, although it may slightly affect the water table. A Nuisance Brook diversion was created to the southeast of Lot 88, in the wetlands area, which diverts some of the surface water from the natural drainage area around Lot 88 to the other natural drainage area.
At some time after 1953 but before 1981, private developers built housing developments to the east and south of Lot 88. The Pinedale Street development, located east of Lot 88, was built on the two slopes of a hill whose base was close to the edge of Lot 88. The water that drained from the two sides of the hill naturally collected in a drain at the bottom of the hill, and a drainage pipe emptied the water into a “paper street” (actually part of a neighbor’s driveway) that naturally flowed down the slope of the street onto Lot 88 and eventually into Nuisance Brook. The Oak Street development, south of Lot 88, had two catch basins that collected the water falling down the hill onto Oak Street, and these catch basins were connected to a drainage pipe that emptied this water into Lot 89.
By 1981, Lot 88 was becoming wetter, and the Brousseaus made demand on the Town of Southbridge to address the problem. The Town agreed to dredge Nuisance Brook, which had been filling with sand and silt. In return, the Brousseaus agreed to execute what was called a Perpetual Flowage Easement,, which released the Town from any damage claims resulting from its dredging of Nuisance Brook. The dredging helped the surface water problem only temporarily; Nuisance Brook over time refilled with sand and silt.
The Brousseaus have articulated three separate complaints to the Town concerning surface water draining onto their property, which they blame for the increased wetness and flooding of Lot 88. First, they contend that the surface water coming down the steep slopes of Pinedale Street onto the Brousseau property moves with great velocity, and consequently brings with it considerable sand and silt, which is filling up Nuisance Brook. In addition, the velocity of the water when it reaches the Brousseau property from Pinedale Street has produced erosion on their property, adding to the silt problem on Nuisance Brook. Second, they claim that a great volume of surface water from Oak Street flows onto Lot 89, thereby raising the water level on their property. Third, the Brousseaus complain that water flowing down Highland Street is flowing into the furthest westerly comer of Lot 89, raising the water level in the wetlands in the separate drainage area to the southwest of Lot 88.
The Town has made good faith efforts to respond to these complaints. In 1995, it again dredged Nuisance Brook and also installed a large concrete sedimentation chamber at the base of Pinedale Street, near the paper street, to catch and hold any sand from the roadway that is brought by the surface waters. This concrete basin is periodically checked and is collecting the sand in accordance with its design; it has yet to have exceeded its capacity. With respect to Highland Street, the Town has agreed to build a swale and channel to eliminate some of the overflow from Highland Street and direct it into the Nuisance Brook diversion.
The Brousseaus contend that these efforts, however well intended, are inadequate and seek injunctive relief to ábate the alleged nuisance from the drainage *184 of surface water from Pinedale, Oak, and Highland Streets onto their property.[2] While they seek a general order directing the Town to abate this nuisance, they identify four specific steps that the Town should take to eliminate or at least diminish the wetness and flooding problems resulting from the flow of surface water onto their property, and ask that the Court order the Town to take each of these steps:
1. The construction of a drainage trench and weir near the paper street off Pinedale Street to slow the velocity of the surface water coming onto the Brousseau property, halt the erosion that has caused Nuisance Brook to be refilled with silt, and catch the sand and silt that was not caught by the sedimentation basin.
2. The collection of the surface water from the two catch basins at the base of Oak Street and the construction of a discharge line that will divert this surface water into the Nuisance Brook diversion in the adjacent watershed.
3. The construction of a new catch basin at the intersection of Pinedale and Oak Street that will catch some of the surface water that currently falls from the north down Pinedale Street into the paper street and divert it into the discharge line that will eventually empty into the Nuisance Brook diversion.
4. The construction of a trench in the dike area on Lot 105, off Highland Street, in the separate natural drainage area, that will be deep enough to hold the overflow of surface water coming from Highland Street.
The Brousseaus are only partly correct in attributing the increased wetness and flooding on Lot 88 to the drainage problems resulting from the development of Pinedale and Oak Streets. As their expert Leonard Jalbert conceded, these developments did not appreciably change the amount of water that ultimately ended up in Lot 88. Water flows downhill, whether above or below ground, and would eventually end up in the base of the kettle even if no development had occurred. The developments, especially the paved streets, changed the velocity of the surface water coming into Lot 88, not its overall volume. Therefore, there is no evidence that the amount of surface water flowing into Lot 88 is any greater now than in 1953 when the Brousseaus purchased the property: it is simply getting there faster.
The velocity of the surface water is not without consequence, since it brings with it the sand from the paved streets and increases the erosion that aggravates the silting problem on Nuisance Brook. The sedimentation basin built by the Town in 1995 appears to have successfully captured the sand coming down Pinedale Street, but it has not significantly affected the erosion that leads to the silting of Nuisance Brook. Consequently, the velocity of the surface water coming down Pinedale Street has somewhat added to the wetness and flooding problems of Lot 88 by hastening the clogging of Nuisance Brook from the silt, which in turn slightly raises the water table in the immediate area. To be sure, Nuisance Brook would naturally fill with silt eventually regardless of the erosion, but the erosion significantly speeds up that process.
The development on Oak Street cannot be said to have aggravated the problem, since the water from Oak Street flows naturally and with ordinary velocity into this drainage area. The “fix” suggested by the Brousseaus would change the natural course of this surface water by diverting it to the adjacent, hydraulically separate watershed of the Nuisance Brook diversion. Consequently, it would undo nature, not the effects of development.
The surface water coming from Highland Street naturally flows into the adjacent watershed, which is hydraulically unconnected to the watershed in which Lot 88 is located. As a result, the Highland Street trench suggested by the defendants would also not significantly affect the amount of water on Lot 88.
Moreover, there was another change in the area that affected the wetness and flooding on Lot 88 to a greater degree than these housing developments. In 1953, when the Brousseaus first moved in, there was a pond on Nuisance Brook two houses down from them on Highland Street, but the pond was small and was not dammed. Shortly after they moved in, their neighbor built a small dam to limit the flow of water on Nuisance Brook as it moved from the Brousseau properly down past the pond into the distant reservoir. In 1993, the present owner of this property built a new, higher dam that significantly raised the water level on Nuisance Brook on the Brousseau property. As Mr. Brousseau conceded in his testimony, this higher dam made the wetness and flooding problems on Lot 88 “considerably worse” and substantially added to the silt problem in Nuisance Brook.
In short, the only shortcoming of the Town’s drainage system that significantly affects the wetness and flooding on Lot 88 is the failure to slow the surface water coming down Pinedale Street, because its present velociiy has produced erosion which has accelerated the silting of the Nuisance Brook and raised the water level in the immediate area. The proposed project on Oak Street would likely reduce the wetness and flooding in Lot 88, but it would do so by diverting a large quantify of surface water that naturally flows into the Lot 88 watershed into the adjacent, hydraulically separate watershed. The proposed Highland Street project would not appreciably affect the watershed containing Lot 88.
CONCLUSIONS OF LAW
“In Massachusetts, liability for a private nuisance caused by the flow of surface waters from a landowner’s property to that of an adjoining landowner depends on whether the landowner is making *185 a reasonable use of his land." DeSanctis v. Lynn Water & Sewer Commission, 423 Mass. at 1 16. As described by the Supreme Judicial Court:
Under the reasonable use doctrine, “each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, but incurs liability when his harmful interference with the flow of surface waters is unreasonable.” Armstrong v. Francis Corp., 20 N.J. 320, 327 (1956). Reasonableness is a question of fact. . . based on consideration of all the relevant circumstances including the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter . . . The jurors also must consider whether the utility of the possessor’s use of his land outweighs the gravity of the harm which results from his alteration of the flow of surface waters.
Id.
While the Supreme Judicial Court has declared that the reasonable use doctrine applies to public landowners, id., it is not at all clear that the definition of reasonableness is the same when the public landowner is the alleged perpetrator of the nuisance. On one hand, the Supreme Judicial Court in DeSanctis declared that a public landowner may not be liable for nuisance even when it committed a negligent diversion of surface water, because the public landowner may still have made a reasonable use of its land despite this negligence. Id. at 116-117. However, fourteen years earlier, the Supreme Judicial Court defined a nuisance by a public landowner in the broadest possible terms:
We think, therefore, in the absence of equitable considerations not apparent in the record before us, if the additional drainage onto Triangle’s land attributable to the construction and maintenance of the road causes identifiable and more than de minimis damage, an injunction against its continuation would be appropriate, leaving the DPW to make other drainage arrangements or to take an easement.
Triangle Center, Inc. v. Department of Public Works, 386 Mass. 858, 864 (1982). As a corollary of this holding, the Court ruled that a comparison of the cost of an injunctive remedy with the damage to the plaintiff need not be made in a nuisance action against a public defendant alleging the discharge of surface water onto private land, “because the defendant, having the power to take a drainage easement by eminent domain, can limit its cost to the damage incurred by the adjoining landowner due to the encroachment." Id. In short, while the Supreme Judicial Court in DeSanctis held that a diversion of surface water that was significant enough to be found negligent by a jury did not necessarily constitute an unreasonable use of public land (and therefore may warrant no remedial relief), the Court in Triangle Center held that the drainage of surface water from public to private land constitutes a nuisance requiring remedial relief if it is merely identifiable and more than de minimis. While these standards appear quite different, perhaps incompatible, the Supreme Judicial Court in DeSanctis, far from overruling Triangle Center, cited it in support of its conclusion that the reasonable use doctrine applies to public landowners.
This case requires this Court to sort out these different legal standards. For the reasons given below, this Court will be guided by the more recent legal formulation concerning nuisance articulated in DeSanctis, but its ruling will be informed by the considerations announced in Triangle Court. While a public landowner, like a private one, is legally privileged to make a reasonable use of its land even though such use may alter the flow of surface waters and cause some harm to others, DeSanctis, 423 Mass. at 116, a public landowner may reasonably use its land to cause less harm than a private landowner, largely because it has so simple a remedy to compensate for such harm through the taking of an easement. Triangle Center, 386 Mass. at 864.
In this case, the only identifiable harm to the Brousseaus’ property that may properly be attributed to the construction and maintenance of Town roads results from the increased velocity of the surface water draining into Lot 88 from Pinedale Street. The increase in the speed of this surface water has increased erosion on that Lot, thus filling Nuisance Brook with silt, and carried with it onto Lot 88 some sand and, to a lesser degree, silt from Pinedale Street. The flow of surface water itself down Pinedale Street onto Lot 88 cannot be attributed to Town roads because the expert testimony proffered by both sides agreed that the construction of the roadways on the developments to the east and southeast did not change the total amount of surface water draining onto Lot 88. Indeed, since Lot 88 sits at the base of a natural kettle, those surface waters have drained into it from the higher elevations to its east and southeast probably since the glaciers left the land in its present condition. This natural drainage of surface water cannot be construed to constitute a nuisance since “it was not attributable to the construction and maintenance of the road” or any other Town responsibilily. See Triangle Center, 386 Mass. at 858.
The Town has already taken reasonable steps to alleviate the amount of sand and silt coming down Pinedale Street by building a large concrete sedimentation chamber at the base of Pinedale Street and properly maintaining it to ensure that it does not reach its capacity. However, this correction does not address the problem of erosion, which remains and accelerates the filling of Nuisance Brook with silt. In deciding whether this remaining problem constitutes a nui *186 sanee, I look to all the relevant circumstances, including whether the utility of the Town’s use of its land is outweighed by the gravity of the harm resulting from that use. DeSanctis, 423 Mass. at 116.1 conclude that, while the erosion from the high velocity of surface water coming down Pinedale Street is only a small part of the wetness and flooding problem on Lot 88, it is nonetheless a significant source of that problem. I further find that the problem can be substantially diminished at relatively low cost through the building of the drainage trench and weir near, the paper street off Pinedale Street suggested by the plaintiffs expert and by periodically dredging Nuisance Brook to remove the silt resulting from the residual erosion. These remedies will not make Lot 88 dry, but they should eliminate or greatly reduce the degree to which the Town has aggravated the inevitable wetness and flooding problem. If the Town chooses not to remedy its role in this problem, then it must take a drainage easement on Lot 88 and compensate the Brousseaus for the reduction in the fair market value of Lot 88 resulting from the consequences of the velocity of the surface water coming down Pinedale Street.[3]
No further remedy is warranted. The surface water draining onto Lot 89 from Oak Street drains there naturally, and there is no evidence that any additional surface water enters the Brousseaus’ property as a result of this roadway or that the velocity of the water is any faster. The Brousseaus’ proposal would take water that has always drained into the natural drainage area encompassing Lots 88 and 89, and transfer it into an adjoining but separate drainage area. The Brousseaus are not entitled to a remedy for a problem that the Town did not cause and that pre-dated their purchase of the property. See Escobar v. Continental Baking Co., 33 Mass.App. 104, 109 (1992) (court may consider priority in time in coming to area, especially where price paid for property reflected existence of problems that form the claim for nuisance). Indeed, granting them this relief would provide a windfall to them at the expense of the Town; it would mean that the Town would be spending public money to remove surface water that was flowing naturally onto that land when the Brousseaus purchased it, and diverting it into a separate drainage area, thus increasing the fair market value of the Brousseaus’ land, potentially at the expense of adjacent property owners.[4]
ORDER
For the reasons stated above, it is hereby ORDERED that judgment enter in favor of the plaintiffs on the limited ground that the defendant Town has created a nuisance by causing an increase in the velocity of surface water coming down Pinedale Street into the plaintiffs’ property at Lot 88. The Town is permanently enjoined promptly to make reasonable efforts to abate the conditions resulting from the increase in the velocity of this surface water, specifically the accelerated filling of Nuisance Brook with silt and sand, or take a drainage easement by eminent domain and compensate the plaintiffs for the reduction in fair market value of their property resulting from this nuisance. Although this Court is not specifying what such reasonable efforts must be, it finds that the following course of action would be reasonable under present circumstances:
1. The continued maintenance of the large concrete sedimentation chamber at the base of Pinedale Street, near the paper street, to ensure that it retains its capacity to catch and hold any sand and silt from the roadway that is brought by the surface waters;
2. The construction of a drainage trench and weir near the paper street off Pinedale Street to slow the velocity of the surface water coming onto Lot 88, substantially diminish the erosion that has caused Nuisance Brook to be refilled with silt, and catch the sand and silt that was not caught by the sedimentation basin; and
3. The periodic dredging of Nuisance Brook to remove sand and silt caused by the velocity of the surface water coming down Pinedale Street that remains despite the above two remedial steps.
The plaintiffs’ request for further remedial relief is DENIED.

 Surface water is defined as “waters from rain, melting snow, springs, or seepage, or floods that lie or flow on the surface of the earth and naturally spread over the ground but do not form a part of a natural watercourse or lake.” DeSanctis v. Lynn Water & Sewer Commission, 423 Mass. 112, 115 n.6 (1996).

 The plaintiffs do not seek money damages.

 I do not specifically order these remedial steps for two reasons. First, since they need to be approved by the Conservation Commission under G.L.c. 131, §40 and 310 CMR §10.01 et seq., this Court does not have the authority to order such steps and obviate the required Conservation Commission review. Second, there may be other steps, equally effective and less costly, that may accomplish this purpose, and the Court does not wish to issue an order that would preclude better alternatives.

 Similarly, it should be made clear that this Court does not order the Town to build the construction of a trench in the dike area on Lot 105, off Highland Street, to cope with the surface water coming off Highland Street. Since Highland Street was developed when the Brousseaus moved into Lot 88 and purchased Lot 89, this condition was present at the time of the purchase and there is no evidence that it has significantly deteriorated since that time. Moreover, this surface water, according to the plaintiffs own expert, is flowing into the separate natural drainage area, which is hydraulically unconnected to the drainage area in which Lot 88 and most of Lot 89 is located. Therefore, there is no reason to believe that the surface waters flowing off Highland Street are significantly affecting the wetness and flooding of Lot 88. I applaud the Town for agreeing to address this issue, but it must be made clear that it does so voluntarily and not by order of this Court.