Gants, J.
This case poses at least two fundamental property law issues: (1) What is the proper measure of damages for a trespass onto property? and (2) How should the law resolve the conflict that arises when adjoining landowners pursue incompatible uses of their own property?
Background
The defendant, Donald Melville (“Melville”), is a cranberry farmer who owns roughly thirty acres of land in Carver, on which he operates a number of cranberry bogs. The plaintiff, Cornelia Silva Romboli (“Silva”), owns roughly four acres of land, which she uses solely as her residence, that partially abut Melville’s land. In 1992, after buying a new parcel of land that abutted the rear portion of Silva’s property, Melville built a cranberry bog on what he believed to be his own property. In fact, the bog extended onto roughly 1/ 10th of an acre of Silva’s property, on the portion of her property furthest from her house. From 1992 until at least 1997, when Silva first notified Melville that he was encroaching on her properly, Melville farmed this cranberry bog, including the 1/10 acre belonging to Silva. After he learned of the encroachment, Melville retreated onto his own property and built a dirt dike road separating Silva’s land from his own. However, Melville continues to farm the part of the cranberry bog that rests on his own property, which means that, twice each year, in the fall and again in the winter, he floods the bog with water.[1] As a result of this flooding, water seeps below the ground on Melville’s property and percolates onto the rear of Silva’s adjoining property, raising the water level.
Silva filed her trespass complaint against Melville on March 11, 1998, alleging a continuing common law trespass, both from physical entry and the entry of water, beginning in 1992. Silva also alleged a statutory trespass claim under G.L.c. 242, §7 for Melville’s alleged cutting down and removal of trees and under-wood on her property in 1992 during the construction of his cranberry bog. Silva seeks both money damages and injunctive relief.
On February 13, 2001, after seven days of trial, the jury found that Melville had indeed destroyed woodland on her property in 1992 during the construction of his bog, but concluded that Silva knew or reasonably should have known that he had done so before March 11, 1995, so that her statutory trespass claim was precluded by the three-year statute of limitations. The jury, however, also found that Melville had physically trespassed onto Silva’s property after March 11, 1995, so her common law claim as to these trespasses came within the statute of limitations.[2] The jury was told that, if they found that Silva knew or reasonably should have known of Melville’s trespass before March 11, 1995, Silva was entitled to damages only for trespasses that occurred after that date. See Harrison v. Textron, 367 Mass. 540, 552 (1975); Murphy v. Town of Chatham, 41 Mass.App.Ct. 821, 827 (1996). The jury also found that water from Melville’s property had entered onto Silva’s property after March 11, 1995, but that this entry of water did not result from the unreasonable use of Melville’s land. The jury was told *612 that an unlawful trespass by water existed only if the entry of water from Melville’s land onto Silva’s land was caused by an unreasonable use of Melville’s land or, phrased differently, that Melville’s negligent use of his land caused the flow of water onto Silva’s land. Therefore, in view of the jury's finding on this issue, the jury found no negligent trespass of water.
As a result of the jury’s findings as to liability, the jury was permitted to award damages only for Melville’s continuing physical trespass onto Silva’s property that occurred after March 11,1995. Pragmatically, this meant that the jury needed to evaluate the damages caused to Silva as a result of Melville’s continued farming of her 1 /10 of an acre of cranberry bog after March 11,1995 until he built the dirt dike road on that bog separating his property from hers.
In view of the uncertainty in the law regarding the appropriate measure of damages in trespass cases, this Court asked the jury to make findings on three separate theories of damages: (1) the reduction in the fair market value of Silva’s property caused by Melville’s continuing trespass after March 11, 1995; (2) the loss in Silva’s enjoyment of her property caused by Melville’s continuing trespass after this date; and (3) the cost of reasonably restoring Silva’s property to the condition it was in prior to March 11, 1995. The jury found that the reduction in fair market value was $ 1,400, valued the loss of Silva’s enjoyment in the use of her property at $25,000, and found that the cost of restoration was $50,000. The jury, at the request of the Court, also advised the Court that the cost of restoration was the measure of damages it thought the fairest and most appropriate.[3]
This Court now must determine which of these three measures of damages is indeed the proper measure of damages for the common law trespass committed in this case. It must also determine what, if any, of the injunctive relief sought by the plaintiff should be ordered. In addressing the issue of injunctive relief, this Court must also address plaintiffs contention that she is entitled to injunctive relief to prevent the entry of water onto her property caused by the flooding of defendant’s adjoining cranberry bog.
Discussion
The Appropriate Measure of Damages
As a remedy for trespass, Massachusetts courts in different cases, under differing circumstances, have awarded damages under each of the three alternative theories: reduction in fair market value, loss in enjoyment of use, and cost of restoration.
Where the injury caused by the trespass has been permanent, in most cases the measure of damages has been the difference in the fair market value of the property before and after the trespass. See, e.g., Trinity Church in the City of Boston v. John Hancock Mutual Life Ins. Co., 399 Mass. 43, 48 (1987) (“The general rule for measuring property damage is diminution in market value”); Belkus v. City of Brockton, 282 Mass. 285, 287-88 (1933) (“If the injury is permanent, unchanged by a cessation of the injurious action, the damage is the difference in the fair market value of the injured premises before and after the injury”). Where the injury caused by the trespass is continuous but not permanent, and the property after the trespass is in essentially the same condition as it was before, the measure of damages has been the loss in the rental income of the property. Belkus v. City of Brockton, 282 Mass. at 288. Implicit in these cases is that the value of the encroached property to its owner is purely economic, so that payment of the difference in fair market value and/or the loss in rental income is sufficient to make the injured landowner whole.
However, the law recognizes that “ ‘market value’ does not in all cases afford a correct measure of indemnity, and is not therefore ‘a universal test.’ ” Trinity Church in the City of Boston v. John Hancock Mutual Life Ins. Co., 399 Mass. at 48, quoting Wall v. Platt, 169 Mass. 398, 405-06 (1897). This is most often the case with “special purpose property,” such as the property of non-profit, charitable, or religious organizations, where “there will not generally be an active market from which the diminution in market value may be determined.” Trinity Church in the City of Boston v. John Hancock Mutual Life Ins. Co., 399 Mass. at 48-49. Thus, for instance, when it was determined that the construction of the John Hancock Building in Copley Square in Boston had undermined the foundation of the Trinity Church, the Supreme Judicial Court did not measure the Church’s damages by the loss in the fair market value of the Church. Rather, the Court measured the damages as “the reasonable costs of restoring the church to the condition it was in prior to the Hancock excavation.” Id. at 50.[4]
The Supreme Judicial Court in Trinity Church recognized that, even when the reduction in fair market value could be determined, the cost of restoration may still be the appropriate measure of damages in some situations “where diminution in market value is . . . unsatisfactory as a measure of damages.” Id. at 49. The Court cited three cases in support of this proposition where the cost of restoration, not the reduction in fair market value, was found the more appropriate measure of damages:
(1) Heninger v. Dunn, 101 Cal.App.3d 858, 864-65 (1980), where an irresponsible neighbor bulldozed a rough road, seven-tenths of a mile long, on the plaintiffs property, killing or damaging 225 trees and substantial vegetative undergrowth but improving access to the plaintiffs property and thereby increasing the fair market value of the plaintiffs property;
(2) to Rico v. SS Zoe Colocotroni, 628 F.2d 652, 675-78 (1st Cir. 1980), cert. denied, 450 U.S. 912 (1981), where an oil spill had contaminated a coastal area; and
*613 (3) Maloof v. United States, 242 F.Sup. 175, 183 (D.Md. 1965), where the defendant's negligence extensively damaged woods, the driveway area, and areas around the lawn and buildings of a 55-acre estate where John Hanson, the First President of the United States under the Articles of Confederation, was buried and which the owner had purchased both to house his considerable art collection and to establish as a shrine for the nearly-forgotten Hanson.
In each of these cases, the property had a value to the owner that went far beyond its fair market value. In Heninger, for instance, the owner of the property took little solace in the fact that the road had increased the fair market value of his property because the primary value of the property to him lay in its remote beauty, not its economic value. See 101 Cal.App.3d at 864-65. In such a case, the only way to make the injured property owner whole is to restore the property to the condition it was in before the trespass.
“Where expenditures to restore or to replace to predamage condition are used as the measure of damages, a test of reasonableness is imposed.” Trinity Church in the City of Boston v. John Hancock Mutual Life Ins. Co., 399 Mass. at 50. “In some cases, ‘to make such a restoration would be an uneconomical and improper way of using the property’ and ‘might involve a very large and disproportionate expense to relieve from the consequences of a slight injury.’ ” Id. quoting Hopkins v. American Pneumatic Serv. Co., 194 Mass. 582, 584 (1907).[5]
It is not clear from the case law how to measure the reasonableness of restoration expenses. Certainly, any determination of reasonableness must consider the overall cost of the restoration, the amount of damage inflicted on the property, and whether restoration is realistically possible. See Trinity Church in the City of Boston v. John Hancock Mutual Life Ins. Co., 399 Mass. at 50; Puerto Rico v. SS Zoe Colocotroni, 628 F.2d at 675 (“There may be circumstances where direct restoration of the affected area is either physically impossible or so disproportionately expensive that it would not be reasonable to undertake such a remedy”). Pragmatically, a determination of reasonableness must also consider the magnitude of the plaintiffs loss in her enjoyment of use of the property. If that loss is small and the cost of restoration is great, then it makes little economic sense to oblige the defendant to pay vast sums of money to restore the property to its previous condition, since the plaintiff did not care that much about the property. In fact, in such circumstances, if the plaintiff were awarded the cost of restoration, she would certainly keep the money and not invest it in restoration, since she would derive far more pleasure from the use of the money than the restored use of the property.
The owner’s loss of enjoyment in the use of her property has been recognized as a measure of damages
when (1) the loss of fair rental value is either not calculable or appropriate, or (2) when there is evidence of emotional distress that is not reflected in the loss of fair rental value. See Harrison v. Textron, 367 Mass. at 555-56 & n. 13 (loss of enjoyment from noise, lights, dust, intrusions into one’s privacy, and other inconveniences and annoyances are not compensable because they are reflected in loss of fair rental value of residential property); Schleissner v. Town of Provincetown, 27 Mass.App.Ct. 392, 396 n. 4 (1989) (plaintiffs emotional distress separately compensable where she had suffered “considerable anxiety and distress over the repeated flooding and threat of flooding”).
In the case at bar, Silva testified that the 1 / 10th of an acre in the rear of her property on which Melville trespassed was special to her because it was a place of unusual beauty, of quiet solitude, and of fond memories. By its verdict, the jury appears, at least in part, to credit her testimony that she cared about that portion of her property for reasons beyond its fair market value. Therefore, this Court does not believe that Silva would be fairly compensated for Melville’s trespass simply by paying her the reduction in fair market value caused by his continued trespass. This may compensate her for her economic loss but not for her far greater loss in the enjoyment of this portion of the property.
While recognizing that this 1 / 10 th of an acre meant more to Silva than its fair market value, this Court does not believe that it would be reasonable to award her the cost of restoration. When, as here, the trespass has ended and the cost of restoration of the property is twice the value of the plaintiffs loss of enjoyment in the property, it would be unreasonable to award the cost of restoration because such an award would produce an undeserved windfall to Silva. If the $50,000 award for cost of restoration were paid to her, Silva would receive the money judgment regardless of how she ultimately spent it; the law does not condition payment upon proof that the money is actually used for restoration. When, as here, her loss of enjoyment in the use of the property is valued at only $25,000, one would expect that, if she were awarded the $50,000 cost of restoration, she would not in fact use this money for restoration. Why would one invest $50,000 to obtain $25,000 worth of enjoyment and only a nominal increase in fair market value? In short, it is unreasonable to award the cost of restoration when it so far exceeds the value of loss in enjoyment of use that, if the plaintiff were to receive the cost of restoration, she would likely not devote it to that purpose.
This analysis, although not articulated in the case law, is consistent with the outcomes in the case law. For instance, there can be little doubt, in view of Trinity Church’s architectural, historic, and sentimental significance to its congregation, that the congregation would devote a money judgment paid under *614 a cost of restoration theory to rebuilding the Church on a new foundation rather than to any other purpose, because the loss of enjoyment of its use by the congregation is far greater than even the extraordinary cost of restoration. In contrast, when the fair market value of the portion of the property that suffered the trespass was only $30, and that portion of property was of no practical use or sentimental value to the plaintiff owner of the property, it was held unreasonable to award $1,700 for the cost of restoration, because no person in her right mind would spend $1,700 to reclaim property with no sentimental value and only $30 of economic value. See Blood v. Cohen, 330 Mass. 385 (1953).
This Court’s preference for the loss of enjoyment of use theory of damages in this case is strengthened by the practical difficulties in actually restoring the property to its pre-trespass condition. While Silva presented expert testimony regarding the costs of replanting and nurturing trees and vegetation on this l/10th of an acre, her expert admitted that it would be futile to plant If the area continued to flood twice each year. As discussed below, since the jury found that Melville was making reasonable use of his property, he will be permitted to operate the cranberry bog on his property and to flood his bog in the fall and winter. This will inevitably raise the water level of Silva’s l/10th acre and make reforestation either unlikely or impossible. Therefore, not only would Silva be unlikely to invest the $50,000 cost of restoration in actual restoration because this amount exceeds the value of her enjoyment of the property, she would also be foolish to do so since she would, almost literally, be pouring this money down the drain.
Silva criticizes this measure of damages as being speculative. It is true that it is difficult to place a dollar value on the loss in one’s enjoyment of her property, but it is no more difficult than placing a dollar value on the loss in one’s use of an arm or a leg, which juries do every day when they award damages for pain and suffering in negligence cases. In the case at bar, the jury needed to value the plaintiffs loss in having a special place to walk, to be quiet, and to nurture memories. In a traditional tort case, when a plaintiffs leg is injured by a defendant’s negligence, a jury is routinely asked to value the plaintiffs loss in no longer being able to dance, or to take morning walks, or to walk quickly to the bathroom. This Court recognizes that both of these damage findings are difficult, but it does not find the former any more difficult or “speculative” than the latter. The law recognizes that certain elements of damages are not capable of being determined with mathematical certainty, and allows them to be estimated in accordance with the sound judgment and conscience of the jury.
Therefore, for the reasons stated above, this Court concludes that the fairest and most appropriate measure of damages in this case is the loss in the plaintiff s enjoyment of her use of her property resulting from the defendant’s trespass, which the jury found to be $25,000.
Injunctive Relief
Melville concedes that Silva is entitled to a permanent injunction barring him from physically entering onto her property without her consent. Silva, however, seeks a permanent injunction that would bar Melville from permitting water from his property to enter onto Silva’s property. As demonstrated below, Silva is not entitled to this additional relief.
“In Massachusetts, liability for a private nuisance caused by the flow of surface waters from a landowner’s property to that of an adjoining landowner depends on whether the landowner is making a reasonable use of his land.” DeSanctis v. Lynn Water and Sewer Commission, 423 Mass. 112, 116 (1996). “Under the reasonable use doctrine, ‘each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, but incurs liability when his harmful interference with the flow of surface waters is unreasonable.’ ” Id. quoting Armstrong v. Francis Corp., 20 N.J. 320, 327, 120 A.2d 4 (1956). “Reasonableness is a question of fact for the jurors whose decision is based on consideration of all the relevant circumstances including the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter.” DeSanctis v. Lynn Water and Sewer Commission, 423 Mass. at 116.
The characterization of a cause of action as a negligent trespass rather than a private nuisance does not obviate the plaintiffs need to prove the unreasonableness of the defendant’s use of adjoining land. “A plaintiff may recover under the theory of negligent trespass if the jurors determine that the defendant was negligent and that the defendant’s negligent entry onto the plaintiffs land caused the plaintiff harm.” Id. at 118. Since negligence is defined as the failure to exercise that degree of care which a reasonable person would have exercised under the same circumstances to prevent foreseeable risks of harm to others, a landowner would be found negligent only if he made an unreasonable use of his land that caused water to enter onto the property of another.
While DeSanctis focused on the flow of surface water onto the property of another, there is no reason to believe that the standard should differ for the percolation of water underground onto the property of another, as is present in the case at bar. Silva’s property is equally wet regardless of whether the water from the flooded bog flows over Melville’s property onto hers or percolates underground onto hers.
The jury found that the entry of water onto Silva’s property did not result from the unreasonable use of Melville’s land. In making this finding, the jury recognized that Melville could farm his cranberry bog sue *615 cessfully only if he flooded it twice each year, that his flooding of his property would inevitably raise the water level on her adjoining l/10th of an acre, and that there was nothing that Melville reasonably could do to stop this from happening except to stop farming his bog. The jury concluded that it was more reasonable for Melville to continue to farm his bog and for Silva to put up with the increased water level, than for Melville to abandon his bog so that Silva’s adjoining 1 / 10th of an acre would have a lower water level. This Court concurs with that finding. In view of this factual finding, it would not be equitable to order Melville to cease and desist from allowing water to percolate from his land onto Silva’s, because to do so would require Melville to stop flooding his adjoining cranberry bog, which effectively would require Melville to stop farming that bog.
Order
For the reasons stated above, it is hereby ORDERED that:
(1) Judgment enter on behalf of the plaintiff Silva in the amount of $25,000 for the loss in Silva’s enjoyment of her property caused by the defendant Melville’s continuing trespass after March 11, 1995, plus statutory interest;
(2) A permanent injunction enter against the defendant Melville barring him from physically entering onto Silva’s property without her consent.
(3) The costs of this action shall be borne by the defendant.

A cranberry farmer floods his bog in the fall to harvest the cranberries, which float and can then more easily be gathered. He floods his bog in the winter to protect the cranberry vines from the New England cold.

Silva did not allege that Melville cut or carried away any trees on her property after 1992. She contended that the statute of limitations had not run as to this claim solely because, under the discovery rule, the limitations clock did not begin until she knew or reasonably should have known that Melville had committed a trespass.

The Court informed the attorneys prior to the commencement of trial that it would be bound by the jury’s findings of fact as to damages but would treat the jury’s opinion as to the fairest and most appropriate measure of damages as advisory only.

In Trinity Church, since this damage could not be incrementally repaired, the Court measured the extent to which the Hancock excavation had increased the Chinch’s “angle of distortion” which, when it reached a certain angle, would require the Church to be disassembled and reconstructed. 399 Mass. at 48. The Court then calculated the cost of restoration as the percentage deterioration in the “angle of distortion” multiplied by the total cost of disassembling and reconstructing the Church. 399 Mass. at 50.

Silva contends that this requirement of reasonableness should not apply because Melville’s construction of a bog on her property is functionally equivalent to the construction of a building, wall, or fence on her property, and the law generally requires the defendant to remove such structures even at substantial cost. See, e.g., Capodilupo v. Vozzella, 46 Mass.App.Ct. 224, 226 (1999) (“In Massachusetts a landowner is ordinarily entitled to mandatory equitable relief to compel removal of a structure significantly encroaching on his land, even though the encroachment was unintentional or negligent and the cost of removal is substantial in comparison to any injury suffered by the owner of the lot upon which the encroachment has taken place”), quoting Peters v. Archambault, 361 Mass. 91, 92 (1972). However, Silva’s contention cannot prevail for three reasons. First, Melville's actual construction of the cranberry bog on Silva’s property was completed in 1992 and the trespass was known (or reasonably should have been known) to Silva before March 11, 1995, so she is not entitled to damages resulting from the bog construction; her damages are limited to Melville’s physical trespass onto the property to farm the bog after March 11, 1995, which involved no construction. Second, the case law compelling mandatory removal of a structure has been limited to physical structures, such as buildings, walls, and fences, and has never been extended to the alteration of property that did not involve the construction of a structure on the plaintiffs property. Third, even when encroaching structures have been constructed, the law has not always required the removal of such structures. Remedies other than removal have been ordered “where the unlawful encroachment has been made innocently, and the cost of removal by the defendant would be greatly disproportionate to the injury to the plaintiff from its continuation, or where the substantial rights of the owner may be protected without recourse to an injunction, or where an injunction would be oppressive and inequitable.” Capodilupo v. Vozzella, 46 Mass.App.Ct. at 226, quoting Goulding v. Cook, 422 Mass. 276, 277 n. 3 (1996), which quotes from Peters v. Archambault, 361 Mass. at 93. In short, removal of these structures has not been required when removal would be unreasonable.